63 A.3d 1142

**In re DARRYL P.**

**No. 2942, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

March 25, 2013.

114

116

118

George Harper, Upper Marlboro, MD, for Appellant.

Carrie J. Williams, (Douglas F. Gansler, Attorney General, on the brief), Baltimore, MD, for Appellee.

Panel: KEHOE, WATTS, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

MOYLAN, J.

This appeal raises a single contention. An analysis of that contention, however, implicates enough issues to justify a semester of law school. It is, in a phrase, Hydra-headed. The opinion turns out to be a study of differences. There is a potentially critical difference between an unlawful arrest and an unconstitutional arrest. There is a difference between a federal violation and a state violation. Even at the state level,

there is a significant difference between a constitutional violation and a sub-constitutional violation. An analysis of these differences is necessary to identify the trigger for the Exclusionary Rule of *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). An analysis of these differences may be necessary to mark the threshold for the "Fruit of the Poisonous Tree" Doctrine.

There is a vast difference between the influence on confession law of the Sixth Amendment right to counsel, and the Fifth Amendment privilege against compelled self-incrimination. There is a difference between the constitutional right to counsel under *Massiah* and the prophylactic right to counsel under *Miranda.* There is a difference between the respective triggers of formal accusation and of custodial interrogation, just as there is a difference between the respective coverages that are triggered. There is a difference in how separate rights to counsel are invoked. There is a difference in how separate rights to counsel are waived.

There may (or may not) be a difference between an involuntary confession under the Fifth Amendment privilege according to *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), and an involuntary confession under the Maryland common law according to *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979). There may, on the other hand, be a venerable but long-neglected identity between the two. *Hof v. State,* 97 Md.App. 242, 629 A.2d 1251 (1993), *aff'd on other grounds,* 337 Md. 581, 655 A.2d 370 (1995).

A sure sense of these differences is necessary in a case, such as this, where separate constitutional protections cover the same territory. Litigants too often confront us with a constitutional kaleidoscope, and constitutional overlap can quickly degenerate into constitutional chaos. It does not help to have a Sixth Amendment factor intruding into a Fifth Amendment analysis. It does not help to have a Fifth Amendment factor intruding into a Sixth Amendment analysis. It does not help to have the whole case put in a Fourth Amendment framework of analysis when the Fourth Amend-

ment is not even involved. It is important to keep our analyses in watertight compartments. As the appellant looses his blunderbuss blast at the non-suppression of his confession, however, his grievances are far from being neatly compartmentalized. To mix metaphors, we face the daunting task of trying to unscramble the eggs.

## The Present Case

In the Circuit Court for St. Mary's County, sitting as a juvenile court, the appellant, Darryl P., was, upon an agreed statement of facts, found to be a delinquent for having been involved in an attempted murder. The appellant, then aged 17, was charged with having been involved in the January 6, 2011 shooting of Terrell Swales during an attempted robbery.

The convoluted procedural background throws little light on the single contention raised by the appellant, to wit, that at a pretrial suppression hearing, the judge erroneously ruled that an inculpatory statement given by him to the police was admissible in evidence. The appellant was originally charged, as an adult, with first and second degree assault and with the use of a handgun. The appellant turned himself in on a warrant that had been issued by the District Court of Maryland for St. Mary's County. On February 23, 2011, the appellant was released on $10,000 bail. When interviewed by a deputy sheriff on that occasion, the appellant invoked his right to counsel and all questioning ceased. While his case was still pending in the District Court, the appellant retained counsel and counsel entered his appearance. The appellant was free on bail from February 23, 2011 until he was rearrested on May 6, 2011.

The rearrest was on the basis of an indictment returned by the Grand Jury for St. Mary's County on April 6, 2011, charging the original crimes charged in the District Court warrant as well as several additional charges based on the same criminal conduct. The arrest warrant itself was issued by the circuit court on April 15, 2011. On October 11, 2011, jurisdiction over the appellant's case was waived from the criminal court to the juvenile court.

After jurisdiction had been waived to the juvenile court, the appellant filed, on October 19, 2011, a motion to suppress an inculpatory oral statement he had made to the police following his rearrest on May 6. A suppression hearing was conducted on November 17. On November 29, the suppression hearing judge filed a 14–page Opinion and Order of Court in which he denied the motion to suppress.

Except to explain how the appellant came to be the appellant, this procedural history is largely immaterial. The appellant challenges the admissibility of the inculpatory remarks he made to the police. Whether used to find an adult to be guilty of crime or a juvenile to be delinquent, the confession will be assessed by the same standards.

## The Five Subcontentions

The appellant raises a single contention, but in arguing that contention he lays down a broad enfilade of subcontentions. In appellant's brief there are even bald allegations invoking no less than three separate articles of the Maryland Declaration of Rights. Somewhat more modestly, five subcontentions were actually raised and argued at the suppression hearing and are, therefore, proper grist for the appellate mill. We have reordered their sequence to make for a more fluid analysis:

1. The questioning of the appellant on the early morning of May 6, 2011 followed his "unlawful arrest" and is, therefore, suppressible under the "fruit of the poisonous tree" doctrine;

2. The statement was taken in violation of his prophylactic right to counsel as protected by *Edwards v. Arizona;*

3. The statement was taken in violation of the appellant's Fifth Amendment privilege against compelled self-incrimination;

4. The statement was involuntary according to the Maryland common law; and

5. The statement was taken in violation of the appellant's Sixth Amendment right to the assistance of counsel.

## Arrest, Rearrest, and Bail

█ The appellant's thesis is that at a time when he was already free on bail and had a right to be free of any further custodial restraint, he was erroneously rearrested and that the confession in issue followed as a proximate result of that improper rearrest. It follows, the appellant argues, that the confession should have been suppressed as "the fruit of the poisoned tree." On this subcontention, the appellant may well be right that the court system stumbled in failing to afford him all the liberty that he was entitled to as a result of his bail status. Whether the judicial machinery performed well or ill, however, the possible bureaucratic misstep is, as a reason for suppressing evidence of crime, a tempest in a teapot. Even be it in a teapot, however, the tempest is worthy of assessment.

To make such an assessment, however, it would be helpful if we could thoroughly understand the early history of the appellant's prosecution. That history, however, is frustratingly opaque. We now know, as a result of reviewing the agreed statement of facts that was read to the juvenile court on December 28, 2011, that the underlying crime in this case occurred on January 6, 2011, when the appellant, in the course of an attempted robbery, shot and wounded Terrell Swales. That statement of facts was not presented at the suppression hearing, however, and the suppression hearing court was not informed of what the underlying crime consisted. If we should ultimately be called upon to decide, on the basis of this subcontention, whether the court was right or wrong in declining to suppress the confession, we would have to factor out our knowledge about the circumstances of the underlying crime because our review of the suppression hearing would be limited to what was actually presented to the suppression hearing. On the other hand, there was a file folder in front of the suppression hearing judge, but we are not told what was in that file folder.

At some subsequent time, we infer from allegations in the appellant's brief and not from any evidence presented at the

suppression hearing, the police obtained an arrest warrant for the appellant from the District Court, charging him with 1) first-degree assault, 2) second-degree assault, and 3) the use of a handgun in a crime of violence.[1] The record in this case does not contain that arrest warrant and it was not presented at the suppression hearing.

According to counsel, the appellant then "turned himself in" on those charges. How the appellant learned about those charges against him we don't know. Did the appellant, as a seventeen-year-old, turn himself in of his own accord or did his parents bring him in or did a lawyer or friend bring him in? We don't know. Did the appellant turn himself in to the police, or to the State's Attorney's Office, or to the District Court? Again, we don't know. We are told by counsel that, apparently on February 23, 2011, "[a]ppellant posted a $10,000 bail and was released."[2]

Had the appellant been arrested for a short time after turning himself in or did he have an immediate bail hearing?[3] Was there a condition on the ultimate bail bond that the appellant not leave the state? Was there an actual bail hearing at which the nature of the original crime was at least briefly described? We are told none of this and neither was the suppression court. There is no transcript in the record of any such bail hearing. Counsel does tell us that "while his case was still in District Court, the appellant retained counsel, who entered his appearance in the District Court case"[4] and

---

1. The Maryland Judiciary Case Search website does tell us that the District Court warrant was issued on February 16, 2011.

2. We now know, from drawing several inferences, that bail was posted by the appellant's mother.

3. We now know from the Maryland Judiciary Case Search website that the original arrest warrant was served on the appellant and he was committed on February 22, 2011. Bail was posted and the appellant was released the next day, February 23.

4. We now know that privately retained counsel, retained by the appellant's mother, was Thomas C. Mooney, Esq., of Upper Marlboro in Prince George's County.

further that the "appellant was free on bail from 23 February 2011 until he was rearrested on the 6th of May 2011." The State does not take issue with these factual allegations.

As to what progress the case was making or what progress the investigation was making during that 10–week interim, we are told nothing. As to whether the appellant's lawyer was in contact with the police or in contact with the State's Attorney's Office during that time, we don't know. All we are told is that on April 6, 2011 the Grand Jury handed down an indictment against the appellant based on his alleged criminal actions on January 6, 2011. An analysis of one aspect of the appellant's subcontention calls for us to make a comparison of the original District Court charges with the charges in the April 6, 2011 indictment. The record, however, contains no copy of the indictment nor was it summarized in any specific terms at the suppression hearing.

From the tell-tale format and language of the charging document used at the juvenile delinquency adjudicatory hearing, however, we may infer the specific charges that the indictment probably contained. The juvenile charging document, however, was neither offered in evidence nor referred to at the suppression hearing. The appellant's brief simply states the unilluminating generality that the "indictment included additional charges related to that same offense." The Opinion and Order of the Court recited that the "indictment which led to Respondent's later arrest came from the Circuit Court and included a variety of new charges." What we now know is that the delinquency petition was drawn in seven counts, charging 1) attempted armed robbery, 2) attempted simple robbery, 3) first-degree assault, 4) second-degree assault, 5) reckless endangerment, 6) conspiracy to commit armed robbery, and 7) the use of a handgun. Each count referred to the attack on Terrell Swales on January 6, 2011. Counts 3, 4, and 7 repeated the counts that had been charged before the District Court. Counts 1, 2, 5, and 6 were new. We will assume that the indictment of April 6, 2011 made the same charges.

We are also told, in the briefs by both parties, that an arrest warrant for the appellant based on the April 6, 2011 indictment was issued on April 15, 2011. For both of these dates, both parties rely not on anything found in the transcript of the suppression hearing but on the Maryland Judiciary Case Search website. The April 15 date for the issuing of the arrest warrant raises, for us at least, several additional questions. Is an indictment-based arrest warrant issued automatically along with the indictment? If it is, that would not pose a problem, because the Supreme Court in *Gerstein v. Pugh*, 420 U.S. 103, 119 n. 19, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), made it clear that such a procedure does not offend the Fourth Amendment:

> [T]he Court has held that *an indictment*, "fair upon its face," and returned by a "properly constituted grand jury," *conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry. Ex parte United States*, 287 U.S. 241, 250 [53 S.Ct. 129, 77 L.Ed. 283] (1932). See also *Giodenello [Giordenello] v. United States*, 357 U.S. 480, 487 [78 S.Ct. 1245, 2 L.Ed.2d 1503] (1958). The willingness to let a grand jury's judgment substitute for that of a neutral and detached magistrate is attributable to the grand jury's relationship to the courts and its historical role of protecting individuals from unjust prosecution. See *United States v. Calandra*, 414 U.S. 338, 342–46 [94 S.Ct. 613, 38 L.Ed.2d 561] (1947 [1974]).

(Emphasis supplied).

If automatically issued, however, why would not the arrest warrant have been issued on the same day that the indictment itself was filed? Why a 9–day delay? Or is it the case, in St. Mary's County at least, that the issuance of the arrest warrant requires an actual application by the police or by the State's Attorney's Office to a warrant-issuing judge? If that be the case, why, during that 9–day interim, was not the appellant or the appellant's lawyer of record notified of the indictment and given the opportunity to come in and explain to the court or to the State's Attorney's Office (whether the explanation ulti-

mately sufficed or not) that the appellant had already been placed on bail for that same offense? Above and beyond that query, moreover, what happened to the arrest warrant for the next three weeks, between April 15 and May 6 when it was finally served? Presumably the police knew where the appellant lived. They knew where the appellant's mother, who had posted the bond, lived.

It is the appellant's position that the second arrest warrant, that of April 15, 2011, should never have issued because the appellant had already been permitted bail by the District Court on February 23, 2011, for the same offense, and that that original bail should have continued to guarantee his court appearance. The appellant relies on several Maryland Rules of Procedure and one statutory provision that touch upon the bail question, when a defendant appears first before the District Court and makes bail and is subsequently before the circuit court on the same or substantially similar charges. A simple movement of the identical case from District to circuit court would seem to be covered by Maryland Rule 4–216. 1(b):

> (b) **Continuance of previous conditions.** When conditions of pretrial release have been previously imposed in the District Court, the conditions continue in the circuit court unless amended or revoked pursuant to section (c) of this Rule.

Should the filing of an indictment or a criminal information have been the cause for the movement of the case upward to the circuit court, the conditions of pre-trial release may be amended, but certain procedural restrictions are attached. Maryland Rule 4–216.1(c) covers that situation:

> (c) **Amendment of pretrial release order.** After a charging document has been filed, the court, on motion of any party or on its own initiative and *after notice and opportunity for hearing,* may revoke an order of pretrial release or amend it to impose additional or different conditions of release. If *its decision results in the detention of the defendant, the court shall state the reasons for its action*

*in writing or on the record.* A judge may alter conditions set by a commissioner or another judge.

(Emphasis supplied).

With specific reference to those occasions when the State's Attorney wants an arrest warrant to be issued along with an indictment, Maryland Rule 4-212(d)(2) provides:

Upon the request of the State's Attorney, the court may order issuance of a warrant, ... if an indictment has been filed against the defendant; and (A) the defendant has not been processed and released pursuant to Rule 4-216 or 4-216.1, or (B) the court finds there is *a substantial likelihood that the defendant will not respond to a summons.*[5] ...
Unless the court finds that there is a substantial likelihood that the defendant will not respond to a criminal summons, *the court shall not order issuance of a warrant for a defendant who has been processed and released pursuant to Rule 4-216 or 4-216.1 if the circuit court charging document is based on the same alleged acts or transactions.*

(Emphasis supplied).

Maryland Code, Criminal Procedure Article, Section 5-206 reflects the legislative attitude toward the continuity of the

---

5. In a footnote, the State seizes upon this alternative reason for issuing an arrest warrant and then, in the subjunctive mood, teases us with a creatively delightful anachronism:

 A finding that there was a "substantial likelihood" that Darryl P. would not "respond to a summons" *would have been* appropriate. The indictment charges Darryl P. with three more felonies than the district court charging document, and Saint Mary's County Sheriff's Detective Corporal Robert Merritt testified that he received word that Darryl P. was "fleeing the county and the jurisdiction," and that he arrested Darryl P. on the indictment warrant as he was crossing the Harry Nice bridge into Virginia.

 (Emphasis supplied).

 What that seems to say is: Had the warrant-issuing judge actually been considering whether to continue the original bail or not and had that judge back on April 15, 2011 been able to foretell what would transpire on the banks of the Potomac River three weeks later on May 6, 2011, such foreknowledge could have persuaded the judge to discontinue the bail and issue the arrest warrant. As appealing as such an exercise in time-traveling might have been to H.G. Wells, we must decline to apply it to the case at hand.

bail determination when "a new charging document" is based on "the substantially same set of facts":

§ 5–206. **Reinstatement of bail after discharge at preliminary hearing.** In a criminal case, a judge may reinstate any bail, bond, or recognizance for criminal charges discharged at a preliminary hearing in the District Court, *if a new charging document arises out of the substantially same set of facts.*

(Emphasis supplied).

In the nine-day period between the filing of the indictment and the issuance of the arrest warrant, there was no notice of anything to the appellant or to the appellant's counsel. There was no opportunity for a hearing. The State responds that the papers from the District Court did not arrive at the circuit court until April 21, 2011, six days after the arrest warrant was issued. The State asserts that the warrant-issuing judge was, therefore, unaware that bail had already been posted in the District Court. Though that may be the case, that does not negate the self-evident fact that the State's Attorney's Office, which presumably applied for the arrest warrant and which unquestionably prepared the indictment and obtained the indictment, knew full well about the appellant's bail status. The ignorance excuse won't fly.

The suppression hearing court, however, gave this "illegal arrest" argument based on non-compliance with the Rules of Procedure short shrift:

Respondent first attacks the arrest as illegal under Maryland Rule 4–216(g) and (h) [now Rule 4–216.1(b) and (c) ], and argues that as such, the statement is fruit of the poisonous tree. Maryland Rule 4–216(g) provides that "[w]hen conditions of pretrial release have been previously imposed in the District Court, the conditions continue in the circuit court unless amended or revoked pursuant to section (h) of this Rule." In this case, *the release conditions previously imposed related to the subset of counts that were charged in the District Court. The indictment which led to Respondent's later arrest came from the Circuit Court and*

*included a variety of new charges.* The Court finds that *the rule cited* does apply to situations where a case is transferred from the District Court to the Circuit Court, but *does not apply to Respondent's present situation, in which a separate indictment, alleging new offenses, was later issued by the Circuit Court.* For this reason, Respondent's argument does not avail.

(Emphasis supplied).

We cannot agree, however, that, because the sets of charges against the appellant in the indictment and the original charges against the appellant in the District Court were not identical, the rules controlling the continuance or discontinuance of bail do not apply. All parties agree that both sets of charges arose out of precisely the same criminal incident of January 6, 2011. There was no new information about that crime available on April 6, 2011 that was not already known on February 16, 2011. Rule 4–212(d)(2) explicitly states that, after indictment, "the court shall not order the issuance of a warrant for a defendant" who has already been "processed and released" by the District Court if the new "charging document is *based on the same alleged acts or transactions.*" (Emphasis supplied). The sameness that is the critical criterion inheres not in the charges themselves but in the underlying "acts or transactions" that give rise to the charges. Criminal Procedure Article, Section 5–206 is emphatically clear that the continuity of the bail status may rest upon the fact that the "new charging document *arises out of the substantially same set of facts.*" (Emphasis supplied).

That two sets of charges must arise out of "the substantially same set of facts" is by no means a statement that the two sets of charges must be identical.[6] An indictment will always

---

6. The freely embracing collective notion of charges arising "out of the substantially same set of facts" should not be confused with the far more rigorous and exclusive grouping requirement explained by *Texas v. Cobb,* 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001), for "closely related charges" under the "offense specific" limitation on Sixth Amendment coverage. This latter problem will be discussed *infra.*

be more complex than the initial charges made by an officer in the immediate wake of a crime. An officer on the scene is not a legally trained strategist. An indictment, by contrast, is a carefully designed and frequently pre-fabricated product of a State's Attorney's Office's strategic pleading experience. With multi-count thoroughness, it will cover every conceivable crime that a given set of facts could possibly produce, frequently with significant overlap and deliberate redundancy. It will rarely be identical with the original charges, but it will nonetheless arise out of the same facts. We cannot agree that the controlling rules affecting bail do not apply because the sets of charges were not identical. The difference between the two sets of charges in this case was simply the difference between the first draft and a finished product.

The appellant may well win this tempest or battle in the teapot, however, without necessarily winning the larger war. To pick up on the metaphor on which the appellant rests this entire subcontention, he blithely assumes that a violation of Maryland Rule 4–212(d)(2), for instance, is what *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939), first called "a poisonous tree." That is by no means the case.

### The Fourth Amendment Is Not Involved

**We hold that all evidence obtained by searches and seizures in violation of the Constitution is … inadmissible in a state court.**

 … *Mapp v. Ohio* (1961)

The ultimate issue—the only issue—before us is that of whether the appellant's confession should be excluded from evidence. Ordinarily, evidence is admissible if it is competent, relevant, and material; that is, if it will assist the fact finder in the search for truth. On rare occasions, if there is broad societal disapproval of the means by which the evidence was procured, the evidence may be excluded, but only by means of some exclusionary rule expressly created to apply to such a circumstance. For the allegedly improper arrest and detention the appellant complains of in this case, there is only one

exclusionary rule the appellant could conceivably call upon. That is the Exclusionary Rule of *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). For the last 52 years, it has been available to redress violations of the federal Fourth Amendment in criminal trials in state courts. The appellant, however, must qualify for access to *Mapp*.

The Exclusionary Rule of *Mapp* is not a generic remedy to cure every imaginable wrong. The Exclusionary Rule is reserved for the redress of violations of the federal Fourth Amendment and for nothing else. It is not concerned with violations even of state constitutions. A *fortiori*, it is not concerned with sub-constitutional violations, such as violations of state statutes or of state rules of court. The appellant does not suggest that he is relying upon anything other than the Exclusionary Rule of *Mapp*, but neither does he address his entitlement to *Mapp*. He seems to take that for granted. He may not.

## A. A Violation of State Law Is Not a Fourth Amendment Violation

*Virginia v. Moore*, 553 U.S. 164, 166, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008), posed the issue (the very issue now before us) at the outset of the 9–0 opinion of the Court:

> We consider whether a police officer violates the Fourth Amendment by making *an arrest* based on probable cause but *prohibited by state law.*

(Emphasis supplied).

In that case, Portsmouth, Virginia police officers stopped a car driven by Moore. When the officers determined that Moore's driver's license had been suspended, they arrested him for the misdemeanor of driving on a suspended license. As an incident of that custodial arrest, the officers searched him and recovered 16 grams of crack cocaine and $516 in cash from Moore's person. 553 U.S. at 166–67, 128 S.Ct. 1598. As a matter of law, however, that custodial arrest was an unlawful arrest according to the statutory law of Virginia. Justice Scalia's opinion summarized the Virginia law:

*Under state law, the officers should have issued Moore a summons instead of arresting him. Driving on a suspended license*, like some other misdemeanors, *is not an arrestable offense* except as to those who "fail or refuse to discontinue" the violation, and those whom the officer reasonably believes to be likely to disregard a summons, or likely to harm themselves or others.

553 U.S. at 167, 128 S.Ct. 1598 (emphasis supplied).

Because Virginia law, like Maryland law, "does not, as a general matter, require suppression of evidence obtained in violation of state law," *id.*, it was necessary for Moore to seek succor in the federal Fourth Amendment. Because the physical evidence was unquestionably the result (or "fruit") of his unlawful arrest, "Moore argued ... that suppression was required by the Fourth Amendment." 553 U.S. at 168, 128 S.Ct. 1598. A panel of Virginia's intermediate appellate court agreed with Moore's Fourth Amendment argument, as ultimately did the Virginia Supreme Court.

*The Court reasoned that* since the arresting officers should have issued Moore a citation under state law, and the Fourth Amendment does not permit search incident to a citation, *the arrest search violated the Fourth Amendment.*

*Id.* (emphasis supplied).

## B. An Important Semantic Distinction

The United States Supreme Court reversed the Supreme Court of Virginia. Before turning to its analysis, however, it behooves us to make the critical semantic distinction between an "unlawful arrest" according to state law and an "unlawful arrest" pursuant to the Fourth Amendment. It would be helpful, of course, if people would always refer to the latter not simply as an "unlawful arrest" but as an "unconstitutional arrest." Unfortunately, people do not always talk or write with such precision, and it remains tempting for zealous advocates to take the phrase "unlawful arrest" out of its less significant state context and to use it in a context wherein it may hopefully be given deeper constitutional significance. The Supreme Court, referring to its use of the phrase "lawful

arrest" in *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), explained in *Virginia v. Moore* that when it had earlier used the phrase "lawful arrest," it was using it exclusively in the constitutional sense.

> [W]e have equated a lawful arrest with an arrest based on probable cause: *"A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment;* that intrusion being lawful, a search incident to the arrest requires no additional justification." Moore correctly notes that *several important state-court decisions have defined the lawfulness of arrest in terms of compliance with state law. ... [I]t is not surprising that States have used "lawful" as shorthand for compliance with state law,* while our *constitutional decision in Robinson used "lawful" as shorthand for compliance with constitutional constraints.*

553 U.S. at 177, 128 S.Ct. 1598 (emphasis supplied).

## C. The Core Concern of Probable Cause

Keeping that important semantic distinction in mind, we return to the analysis in *Virginia v. Moore.* The *Virginia v. Moore* opinion made it emphatically clear that an arrest based on probable cause to believe that the arrestee committed the crime for which he is being arrested is a reasonable seizure of the person under the Fourth Amendment and that no further constitutional justification is required.

> In a long line of cases, we have said that *when an officer has probable cause* to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. *The arrest is constitutionally reasonable.*

553 U.S. at 171, 128 S.Ct. 1598 (emphasis supplied).

Quoting its earlier opinion in *Michigan v. DeFillippo,* 443 U.S. 31, 36, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979), *Virginia v. Moore* reaffirmed that

> *a warrantless arrest satisfies the Constitution so long as the officer has "probable cause* to believe that the suspect

has committed an offense." ... Neither *Di Re* [*United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948)] nor the cases following it held that violations of state arrest law are also violations of the Fourth Amendment, and our more recent decisions, discussed above, have indicated that *when States go above the Fourth Amendment minimum, the Constitution's protections concerning search and seizure remain the same.*

553 U.S. at 173, 128 S.Ct. 1598 (emphasis supplied).

## D. Statutory Violations, State and Federal, Are Sub-Constitutional

■ Just as the violation of a state arrest statute is not unconstitutional *per se,* neither is a violation of a federal arrest statute.

None of the early Fourth Amendment cases that scholars have identified sought to base a constitutional claim on *a violation of a* state or *federal statute concerning arrest.*

553 U.S. at 169, 128 S.Ct. 1598 (emphasis supplied).

In a series of landmark decisions over four decades, the Supreme Court has declined to treat violations of state law as violations of the Fourth Amendment and as a basis, therefore, for applying the Exclusionary Rule of *Mapp v. Ohio:*

Our decisions counsel against changing this calculus when a State chooses to protect privacy beyond the level that the Fourth Amendment requires. *We have treated additional protections exclusively as matters of state law.* In *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), we reversed a state court that had held the search of a seized vehicle to be in violation of the Fourth Amendment because state law did not explicitly authorize the search. We concluded that *whether state law authorized the search was irrelevant.* States, we have said, remained free "to impose higher standards on searches and seizures than required by the Federal Constitution," *id.* at 62 [87 S.Ct. 788], but *regardless of state rules, police could search a*

*lawfully seized vehicle as a matter of federal constitutional law.*

In *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), we held that *search of an individual's garbage forbidden by California's Constitution was not forbidden by the Fourth Amendment. "[W]hether or not a search is reasonable within the meaning of the Fourth Amendment,"* we said, *has never "depend[ed] on the law of the particular State in which the search occurs." Id.* at 43 [108 S.Ct. 1625]. While "[i]ndividual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution," *id., state law did not alter the content of the Fourth Amendment.*

We have applied the same principle in the seizure context. *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), held that *police officers had acted reasonably in stopping a car, even though their action violated regulations limiting the authority of plainclothes officers* in unmarked vehicles. We thought it obvious that *the Fourth Amendment's meaning did not change with local law enforcement practices—even practices set by rule.* While those practices "vary from place to place and from time to time," *Fourth Amendment protections* are not "so variable" and *cannot "be made to turn upon such trivialities." Id.* at 815 [116 S.Ct. 1769].

553 U.S. at 171–72, 128 S.Ct. 1598 (emphasis supplied).

### E. The Arrest *Sub Judice* Passed Constitutional Muster

█ The arrest of the appellant in this case was indisputably based on probable cause to believe that he had committed the offenses charged on January 6, 2011. That probable cause was established 1) by the arrest warrant issued on February 16, 2011; 2) confirmed by the bail hearing on February 23, 2011; 3) reconfirmed by the Grand Jury indictment filed on April 6, 2011, *Gerstein v. Pugh,* 420 U.S. at 119 n. 19, 95 S.Ct. 854; and 4) confirmed again by the arrest warrant issued on April 15, 2011. The Fourth Amendment requires nothing

more. Neither a Maryland statute nor rule of procedure can render unconstitutional what the Fourth Amendment deems to be constitutional.

A State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive one unreasonable and hence unconstitutional.

553 U.S. at 174, 128 S.Ct. 1598.

## F. Maryland Has No Exclusionary Rule

██ Even if, *arguendo*, the appellant had shown a violation of Article 26 of the Maryland Declaration of Rights (he has not), there would be no exclusionary rule available to him for such a violation. The only exclusionary device that the appellant could possibly invoke is the Exclusionary Rule of *Mapp v. Ohio* and that Rule applies only to violations of the federal Fourth Amendment. Maryland has no exclusionary rule of its own.

In *Belton v. State*, 228 Md. 17, 20–22, 178 A.2d 409 (1962), the Court of Appeals explained that Maryland had never excluded evidence of crime based on the methods by which the evidence had been obtained and that, following June 19, 1961, Maryland did so only under the constitutional compulsion of *Mapp v. Ohio.* In *Brown v. State*, 397 Md. 89, 98, 916 A.2d 245 (2007), Judge Raker wrote for the Court of Appeals:

Although the alleged conduct may also violate the Maryland Declaration of Rights, because *there is no general exclusionary provision in Maryland* for such violations, *the conduct must violate the federal Constitution to be excluded.*

(Emphasis supplied). See also *Fitzgerald v. State*, 384 Md. 484, 507, 864 A.2d 1006 (2004) ("Fitzgerald acknowledges our precedent declining to recognize an exclusionary rule under our Declaration of Rights."); *Chu v. Anne Arundel County*, 311 Md. 673, 676–86, 537 A.2d 250 (1988) (The Court thoroughly reviewed the history of federal exclusionary principles and their rejection in Maryland, pointing out particularly how the Maryland General Assembly, in enacting Chapter 74 of the

Acts of 1958, rejected a proposed exclusionary rule for violations of Maryland's search warrant statute.).

In *Miller v. State*, 151 Md.App. 235, 824 A.2d 1017, *cert. denied*, 377 Md. 113, 832 A.2d 205 (2003), this Court was dealing with a suppression claim based on an allegedly unlawful arrest. In rejecting the claim, Judge (now Chief Judge) Krauser wrote for this Court:

> But even if the officers did not have authority under § 2–102 of the Maryland Criminal Procedure Article to arrest appellant, *the court had no legal basis upon which to suppress the evidence* obtained from that arrest. *Maryland does not have an independent exclusionary rule* nor does § 2–102 create one.

151 Md.App. at 246, 824 A.2d 1017 (emphasis supplied).

In *Padilla v. State*, 180 Md.App. 210, 232, 949 A.2d 68 (2008), this Court pointed out specifically that there is no exclusionary rule for a violation of Article 26 of the Maryland Declaration of Rights:

> Even if we were to hold that the dog scan in the instant case violated Article 26, appellant's claim would fail. This is because *no exclusionary rule exists for a violation of Article 26.*

(Emphasis supplied). The opinion traced the history of Maryland's rejection of the exclusionary principle to the Court of Appeals's decision in *Meisinger v. State*, 155 Md. 195, 141 A. 536 (1928).

> In the period before *Mapp, Maryland courts repeatedly rejected the notion of an exclusionary rule based on Article 26,* instead adhering to the rule that "when *evidence* offered in a criminal trial is otherwise admissible, it *will not be rejected because of the manner of its obtention." Meisinger v. State* (1928). See also *Lambert v. State* [196 Md. 57, 75 A.2d 327] (1950); *Marshall v. State* [182 Md. 379, 35 A.2d 115] (1943); *Lawrence v. State* [103 Md. 17, 63 A. 96] (1906).

(Emphasis supplied).

In tracing the history, the *Padilla* opinion pointed out that Maryland's rejection of an exclusionary rule was by no means aberrational:

In reaffirming *Lawrence,* the *Meisinger* Court also noted that its view was "supported and fortified by the weight of authority elsewhere." In *Wolf* [*v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) ], the Supreme Court cited *Meisinger* to place *Maryland in the company of twenty-nine other states that,* after *Weeks* [*v. U.S.*], [232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) ] *had evaluated the admissibility of evidence obtained by unlawful search and seizure and rejected the Weeks exclusionary rule as a matter of state law.*

180 Md.App. at 235–36, 949 A.2d 68 (emphasis supplied). Indeed, *Meisinger* itself had held, 155 Md. at 199, 141 A. 536:

[*T* ]*he Court is not concerned with the collateral question of how such evidence may have been procured.* The question of the guilt or innocence of the accused cannot be affected by its method of procurement, if the evidence offered is in itself germane and pertinent to the issue to be decided.

(Emphasis supplied).

As recently as *Ford v. State,* 184 Md.App. 535, 568, 967 A.2d 210 (2009), Judge Salmon stated for this Court:

The common law in Maryland is that *this State does not recognize* (in criminal cases) *an exclusionary rule* when physical evidence is illegally seized by the police.

(Emphasis supplied).

In *Howell v. State,* 60 Md.App. 463, 468 n. 2, 483 A.2d 780 (1984), the Court of Special Appeals did not mince its words:

*Maryland,* of course, *has no exclusionary rule.* Following the lead of Judge Cardozo in *People v. Defore*[, 242 N.Y. 13, 150 N.E. 585] (1926), Maryland is one of the approximately thirty jurisdictions that affirmatively rejected the exclusionary rule.

(Emphasis supplied).

The only exclusionary rule extant in Maryland is that of *Mapp v. Ohio.* In that regard, *Fitzgerald v. State,* 153 Md. App. 601, 682 n. 4, 837 A.2d 989 (2003), *aff'd,* 384 Md. 484, 864 A.2d 1006 (2004), observed:

> *Maryland has no independent exclusionary rule* for physical evidence. Maryland has always been among the overwhelming majority of American states that have, on balance, opted against an exclusionary rule for search and seizure violations. The only extant exclusionary rule that the appellant can call upon is that imposed upon Maryland in 1961 by *Mapp v. Ohio. Mapp's exclusionary rule,* of course, *is available only for violations of the federal Fourth Amendment.*

(Emphasis supplied). See also *State v. Savage,* 170 Md.App. 149, 198–211, 906 A.2d 1054 (2006); *Sun Kin Chan v. State,* 78 Md.App. 287, 294–95, 552 A.2d 1351 (1989); *In re Special Investigation No. 228,* 54 Md.App. 149, 458 A.2d 820 (1953). And see Irma S. Raker, "Fourth Amendment and Independent State Grounds," 77 *Miss. L.J.* 401, 408–11 (2007) ("[T]oday, in Maryland, other than the federal exclusionary rule, *the Court has not recognized an exclusionary rule for illegally seized evidence under Article 26.*")(emphasis supplied).

The appellant, indeed, is not even urging an independent Maryland exclusionary rule upon us. He is simply taking such a rule for granted. It is not there.

## G. Exclusionary Unavailability for Sub–Constitutional Violations

The appellant is twice bereft. Even if, purely *arguendo,* Maryland were to adopt (while this case is still non-final) an independent exclusionary rule of its own, it is highly unlikely that it would reach down to any police infractions below the level of violating Article 26 of the Maryland Declaration of Rights. Even when a state has opted to adopt its own independent exclusionary rule, it is almost universally the case that exclusion is only for constitutional violations and not for breaches of the law only at a sub-constitutional level. Just as a statutory violation is sub-constitutional, so too is a violation of a court-promulgated rule of procedure. A violation of Criminal Procedure Article, § 5–206 or a violation of Maryland Rules of Procedure 4–212 or 4–216.1 simply would not reach up to that level of minimum eligibility for even a

hypothetical Maryland exclusionary rule. For the appellant, there simply is no exclusionary relief, either in reality or in hypothesizing.

The unavailability of an exclusionary rule at the sub-constitutional level is a completely natural and unremarkable phenomenon. As cases such as *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); and *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), have made clear over the decades and as the more recent opinions in *Hudson v. Michigan*, 547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) and *Herring v. United States*, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009), have prominently highlighted, the Exclusionary Rule has never been looked upon as an unmixed blessing.

The Exclusionary Rule is a clumsy instrument, and the Supreme Court has consistently admonished us that society "pays a heavy price" in setting dangerous felons free when the excluded evidence would have proved them guilty of crime. The Rule's highly selective application, therefore, has always required a delicate balancing between society's interest and the interest of the defendant. The Supreme Court has steadfastly insisted that any application of the Rule must "pay its own way" in terms of grave and serious defense concerns. It is a jailhouse myth, therefore, that the law is eagerly awaiting the chance to apply the Rule to every minor impropriety or illegality. In Maryland, the Exclusionary Rule applies only to violations of the federal Fourth Amendment and to nothing else.

## H. The "Good Faith" Defense Is Irrelevant

Just as the narrow compass of the Exclusionary Rule makes the main thrust of the appellant's attack irrelevant, it also makes the main thrust of the State's counterattack equally irrelevant. The appellant's first contention is that the confession in issue is the poisoned fruit of the appellant's unlawful arrest. The heart of the State's response is that,

regardless of whether the arrest was unlawful or not, the police did nothing unreasonable in serving the warrant and that this would, therefore, be a proper case to apply the good faith exception to the Exclusionary Rule.

The so-called "good faith doctrine" or "good faith exception" of *United States v. Leon, supra,* and *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), however, does not exist in a vacuum. It is an aspect of Fourth Amendment law and nothing beyond that. It is a part of the Fourth Amendment whole. It is an exception to the Exclusionary Rule. Indeed, the animating rationale of the good faith exception is tied tightly to the Exclusionary Rule's limited purpose of deterring unreasonable police conduct. If the Exclusionary Rule served a broader purpose, the good faith exception would make no sense.

Because the Fourth Amendment and the Exclusionary Rule of *Mapp v. Ohio* do not apply to this case, therefore, neither does the good faith exception to that Exclusionary Rule. It is only in the universe of the Exclusionary Rule of *Mapp* that the "good faith doctrine" even exists. Where the Rule does not apply, the exception to the Rule cannot apply.

### The "Fruit of the Poisonous Tree" Doctrine

■ As we undertake a discussion of the "fruit of the poisonous tree" doctrine, our first challenge is somehow to classify it. It is illusive. It builds on existing exclusionary principles for two or three federal constitutional protections by announcing the logically unremarkable proposition that when violations of those protections produce evidence of crime, the available suppression remedies will extend not only to the direct or immediate products of the violation but to the indirect or derivative products as well. It is because of the stretching out of the causal link between the cause and the effect that the "fruit of the poisonous tree" doctrine has been particularly susceptible to the defense of attenuation, as that concept has been thoroughly explicated in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ The overwhelming majority of the cases excluding the "fruit of the poisonous tree" were triggered by Fourth Amendment violations. From the birth of the doctrine in 1920 through 1967, the Fourth Amendment was the only constitutional provision to serve as a trigger. As our survey will show, most of the cases applying the doctrine, federal and state, also referred to it as a Fourth Amendment doctrine. There is a massive overlap between exclusion pursuant to the "fruit of the poisonous tree" doctrine and exclusion pursuant to *Mapp v. Ohio,* but the two exclusions are, to be sure, not identical. Where the two exclusions overlap, to wit, where the trigger is an alleged Fourth Amendment violation, *Mapp v. Ohio* controls the field and it is not necessary to discuss the exclusion in any other terms. In the present case, for instance, the appellant claims that an unlawful arrest calls for the suppression of his confession. In such a case, the failure of the appellant to qualify for exclusion pursuant to *Mapp v. Ohio* is, *ipso facto,* the failure to qualify for exclusion pursuant to the "fruit of the poisonous tree" doctrine.

At its extreme outer edges, however, the "fruit of the poisonous tree" doctrine does cover some situations beyond the Fourth Amendment. In *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the poisonous tree was also a violation of the Sixth Amendment right to counsel and the tainted fruit was a line-up identification. In *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the poisonous tree was a violation of the Sixth Amendment right to counsel and the allegedly tainted fruit was the body of the murder victim. In *Nix v. Williams,* 467 U.S. at 442, 104 S.Ct. 2501, Chief Justice Burger discussed this wider coverage of the doctrine.

Although *Silverthorne* and *Wong Sun* involved violations of the Fourth Amendment, *the "fruit of the poisonous tree" doctrine has not been limited to cases in which there has been a Fourth Amendment violation.* The Court has applied the doctrine where the violations were of the Sixth Amendment, see *United States v. Wade,* 388 U.S. 218 [87

S.Ct. 1926, 18 L.Ed.2d 1149] (1967), as well as of the Fifth Amendment.

(Emphasis supplied).

██ Because so many of the cases applied, and still apply, the Fourth Amendment label to the doctrine, however, our discussion may on occasion lapse into that usage. In the case of this appellant, however, the choice of label will not make any difference because he alleges, as the trigger for exclusion, an unlawful arrest of his person and his possible recourse would be, of necessity, to *Mapp v. Ohio.* Under either the narrower Fourth Amendment label or the more technically correct broader label (once one is generally agreed upon), one critical common denominator is clear. The only trigger for exclusion under the "fruit of the poisonous tree" doctrine is the violation of a federal constitutional right.[7]

The doctrine was long regarded as a part of the Fourth Amendment. It was first recognized in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). After finding a Fourth Amendment violation, the Supreme Court carried the exclusionary sanction forward to the second generation of improper use, as it prohibited the indirect or derivative use of the evidence as well as its direct use. In the words of Justice Holmes, "The essence of a

---

7. To be sure, it was an alleged violation of the Maryland Wiretapping Act that triggered the "fruit of the poisonous tree" analysis in *Miles v. State,* 365 Md. 488, 781 A.2d 787 (2001). In terms of the requirement for a constitutional trigger, this is truly the exception that proves the rule. A violation of either the Maryland Wiretapping Act or of Title III of the federal Omnibus Crime and Safe Streets Act of 1968 is not, like an ordinary statutory violation, a case of the "Fourth Amendment minus" but rather a case of the "Fourth Amendment plus." The Supreme Court in both *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), made it clear to the national law enforcement community that any act authorizing wiretapping or electronic eavesdropping that did not fully embody every protection of the Fourth Amendment would, *ipso facto,* result in a finding that the Fourth Amendment had been violated. See *Davis v. State,* 199 Md.App. 273, 276–79, 21 A.3d 181 (2011), *aff'd,* 426 Md. 211, 43 A.3d 1044 (2012). The alleged violation in *Miles* was tantamount to a federal constitutional violation.

provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." 251 U.S. at 392, 40 S.Ct. 182.

It was on the second occasion of the doctrine's use in *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939), that Justice Frankfurter coined the vivid description of derivative evidence as the "fruit of the poisonous tree." The phrase has had staying power. The doctrine reached full fruition in *Wong Sun v. United States* with the development of the notion of attenuation of taint as a reason not to exclude the derivative evidence. *Wong Sun* described the doctrine as an aspect of the Fourth Amendment and one that depended for its enforcement on the exclusionary power of the Fourth Amendment.

> The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in *Silverman v. United States* [365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)] that the *Fourth Amendment may protect against the overhearing of verbal statements a well as against the more traditional seizure of "papers and effects."* ... *Thus, verbal evidence* which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case *is no less the "fruit" of official illegality than the more common tangible fruits of the unwarranted intrusion. Nor do policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence.*

(Emphasis supplied). Thus, confessions were covered as well as physical evidence. Both were excluded, because they were the fruits, direct or derivative, of a Fourth Amendment violation.

It was only in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), that the "fruit of the poisonous tree" rationale was first applied to a state criminal trial. The trigger in *Brown* was again a Fourth Amendment violation.

It led to an oral statement that was properly *Mirandized.* Notwithstanding the fact that the Fifth Amendment had been fully satisfied by the *Miranda* warnings, it was the Fourth Amendment violation that called for the exclusion of the confession under the "fruit of the poisonous tree" doctrine.

> *The exclusionary rule* thus *was applied* in *Wong Sun primarily to protect Fourth Amendment rights.* Protection of the Fifth Amendment right against self-incrimination was not the Court's paramount concern there.... The Court in *Wong Sun* ... emphasized that *application of the exclusionary rule ... protected Fourth Amendment guarantees.*

422 U.S. at 599, 95 S.Ct. 2254 (emphasis supplied).

The Supreme Court was outspoken that the exclusion of a confession under the "fruit of the poisonous tree" doctrine was an aspect of Fourth Amendment law following a Fourth Amendment violation. "The exclusionary rule, when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth." 422 U.S. at 601, 95 S.Ct. 2254. "*Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment." 422 U.S. at 602, 95 S.Ct. 2254.

The first Maryland appellate decision to recognize *Brown v. Illinois* was that of this Court in *Ryon v. State,* 29 Md.App. 62, 349 A.2d 393 (1975). Judge Orth's opinion made it clear that it was Fourth Amendment law that was being applied:

> *The Fourth Amendment exclusionary rule applies equally to statements* and tangible evidence obtained following an illegal arrest or an otherwise illegal search and seizure.

29 Md.App. at 71, 349 A.2d 393 (emphasis supplied). In a one-page *per curiam* decision in *State v. Ryon,* 278 Md. 302, 363 A.2d 243 (1976), the Court of Appeals put its imprimatur on Judge Orth's analysis. See also *Ferguson v. State,* 301 Md. 542, 548, 483 A.2d 1255 (1984) (*"[T]he Court extended the exclusionary rule to evidence that was the indirect product or 'fruit' of police misconduct in violation of the fourth amend-*

*ment.*" (Emphasis supplied)); *Miles v. State,* 365 Md. 488, 781 A.2d 787 (2001).

Our point is that the "fruit of the poisonous tree" doctrine was not considered to be an independent exclusionary principle but was simply an integral part of the Exclusionary Rule of *Mapp v. Ohio,* as it was extended to derivative evidence. The appellant seems to believe that there is some general exclusionary power inherent in the "fruit of the poisonous tree" doctrine that may apply even when the Exclusionary Rule of *Mapp* does not. If that were the case, it would be ironic in the extreme. The topsy-turvy result would be that even where *Mapp* would not suppress the direct "fruits" or immediate results of an unreasonable search and seizure, this "other" exclusionary force would suppress the indirect "fruits" or merely derivative results of the impropriety. Such reasoning would be logically nonsensical.

Most of the Supreme Court cases since *Brown v. Illinois* that have applied a "fruit of the poisonous tree" analysis have been cases that began with a clear Fourth Amendment violation. *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (fingerprint following an illegal seizure); *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (line-up identification following illegal arrest); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (confession after illegal arrest); *United States v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (photographic identification following illegal arrest) ("In the typical 'fruit of the poisonous tree' case, the challenged evidence was acquired by the police after some initial Fourth Amendment violation."); *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) (confession following illegal arrest); *Kaupp v. Texas,* 538 U.S. 626, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (confession following illegal arrest).

More often than not, the alleged "fruit of the poisonous tree" is a confession. The leading academic authority on confession law in Maryland is Jezic, Molony, Nolan and Woodward, *Maryland Law of Confessions* (2012–13 edition). In

Chapter 15, "Confessions Derived From Illegal Searches and Seizures," § 15. 1, p. 733, that work identifies the "fruit of the poisonous tree" doctrine as an aspect of Fourth Amendment law.

In determining the admissibility of a confession stemming from an illegal search or seizure, *a Fourth Amendment "fruits" analysis must be undertaken.* As a result of an illegal search or seizure, a subsequent voluntary confession, although obtained in conformance with *Miranda,* may nonetheless be suppressed as the "fruit of the poisonous tree."

(Emphasis supplied).

Because, as we have already discussed at great length, the Fourth Amendment is not involved in this case, neither is the "fruit of the poisonous tree" doctrine. As solid proof that Maryland does not have some independent exclusionary doctrine for fruits of improper search-and-seizure-related police procedures, we need look only to the survey of Maryland caselaw compiled by Judge Orth in *Ryon v. State, supra,* 29 Md.App. at 73 n. 13, 349 A.2d 393. He there pointed out that the Court of Appeals, in 12 separate decisions, and the Court of Special Appeals, in 15 separate decisions, had consistently declined to exclude derivative evidence because they did not believe the federal practice in that regard, developed in *Wong Sun,* was binding upon Maryland. "The Court of Appeals of Maryland appeared to have disassociated itself promptly from *Wong Sun.* In a long line of cases, starting with *Prescoe v. State,* 231 Md. 486, 191 A.2d 226 (1963), decided 14 May 1963, a majority of the Court indicated that *Wong Sun* was not intended to, and did not, control prosecution in state courts." Maryland began to exclude derivative evidence, such as confessions, only under the constitutional compulsion of *Brown v. Illinois* as of June 26, 1975. The "fruit of the poisonous tree" doctrine is a federal doctrine, not a state doctrine.

The fatal flaw pervading this first subcontention is that while the appellant argues very persuasively in microcosm, he fails to give us a clue as to the macrocosm that is the necessary context for the microcosm. He may well have a

legitimate grievance with respect to bail procedures that were not followed. In terms of the remedy he seeks, however, his problem is that his complaint is not a federal complaint. Neither is it a Fourth Amendment complaint. Neither is it even a constitutional complaint. Microcosmically he may be in the right pew, but macrocosmically he is not in the right church. The first subcontention fails.

### *Edwards v. Arizona* Inapplicable

**[A]n accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police.**

... *Edwards v. Arizona* (1981)

██ The appellant's second subcontention threatened to lead us on a wild goose chase. The subject of possible suppression was the four-part interrogation of the appellant by Detective Corporal Robert Merritt on the early morning of May 6, 2011. From the beginning of that interview at approximately 1:30 a.m. to its conclusion at approximately 4:00 a.m., Corporal Merritt, obviously anticipating a later courtroom examination, was obsessed with the question of who had initiated that early morning conversation. Throughout the interrogation, Corporal Merritt, with drumbeat repetition, kept trying to get the appellant to agree that it was the appellant himself who initially had wanted to talk to Corporal Merritt and not vice-versa. At 3:55 a.m., the coda to the interrogation resounded this early and persistently sounded leitmotif:

MERRITT: And, you saw me, and you recognized me, correct?

[THE APPELLANT]: Yes.

MERRITT: And *you asked, can we talk? You wanted to talk to me, correct?*

[THE APPELLANT]: Yeah.

MERRITT: So, and, and you kept asking me, I was going back and forth from my, from getting stuff out of my truck, ah, my, my police vehicle to the car, and talking to the other officers. *And each time I came back, you were asking, hey, can we talk, correct?*

[THE APPELLANT]: Um hm (positive response)

MERRITT: Is that correct?

[THE APPELLANT]: Yeah.

MERRITT: *And you initiated contact with me about talking, correct?*

[THE APPELLANT]: Um hm (positive response)

\* \* \*

MERRITT: And you, 'cau, because *you wanted to talk to me, correct?*

[THE APPELLANT]: Yes.

(Emphasis supplied).

At the suppression hearing on November 17, 2011, the appellant's position was made very clear that the appellant had never indicated to Corporal Merritt that he wanted to talk about "the case," to wit, about the attack on Terrell Swales on January 6, 2011, but only wanted to know why he was being arrested in the middle of the night at the northern pier of the Potomac River Bridge. Defense counsel cross-examined Corporal Merritt:

[DEFENSE COUNSEL]: It's true, is it not, that *[the appellant] then asked you what was going on, did he not?*

[MERRITT]: *I believe he did.*

[DEFENSE COUNSEL]: *He asked you why he was being arrested, did he not?*

[MERRITT]: I don't believe that was his words, no.

[DEFENSE COUNSEL]: It's true, is it not, that [the appellant] asked you several times what was going on?

[MERRITT]: Yes.

[DEFENSE COUNSEL]: And it's true, is it not, that *you asked [the appellant] several times whether or not he wanted to talk to you about what was going on?*

[MERRITT]: When I first made contact with him, no. I don't believe I asked him several times during the first contact if he wanted to talk to me.

(Emphasis supplied).

Battle was joined and never let up as to whether the appellant wanted to talk about (or, actually, to hear about) 1) "what was going on" with his rearrest or 2) the alleged crime of January 6, 2011. The former, the appellant goes to lengths to point out, is not the latter.

[DEFENSE COUNSEL]: It is true that at some point *you did ask him whether he wanted to hear about what was going on?*

[MERRITT]: Yes.

[DEFENSE COUNSEL]: Now *it is true also,* is it not, *that he answered that he wanted to hear what was going on?*

[MERRITT]: *Yes.*

[DEFENSE COUNSEL]: Did he not?

[MERRITT]: Yes.

[DEFENSE COUNSEL]: *It's also true, is it not, that he never said that he wanted to talk to you about what was going on?*

[MERRITT]: *I asked him do you want to talk to me about what's going on here.* That's a simple question. And he replied yeah.

(Emphasis supplied).

The battle raged on, with Corporal Merritt remaining deliberately oblivious to the fact that there might be a difference between the question, "Did he want to talk to you?" and the question, "What did he want to talk to you about?"

[DEFENSE COUNSEL]: *It's true, is it not, that* immediately after saying yeah, *he said, I can hear what's going on. I don't know what's going* on?

[MERRITT]: *Yes.*

[DEFENSE COUNSEL]: Is that true?

[MERRITT]: Yes.

[DEFENSE COUNSEL]: Indicating that *when he said yeah, he meant he could hear you, true?*

[MERRITT]: *No,* my interpretation of yeah is a common response to yes.

[DEFENSE COUNSEL]: Well, it's true, is it not, that you didn't understand that at the time?

[MERRITT]: I understand yeah to be yes.

[DEFENSE COUNSEL]: But at the time *you didn't think he was saying that he wanted to talk to you, did you?*

[MERRITT]: *No, I clearly understood that he wanted to talk to me.*

(Emphasis supplied).

This routine went on interminably, with the defense team and Corporal Merritt talking across each other and never meeting on common ground. To the appellant, the inquiry was one of "to talk about what." Corporal Merritt stubbornly limited the inquiry to one of "to talk," preferring to leave the object of the talk unidentified. If the appellant had wanted to talk about global warming, Corporal Merritt would have insisted that it was the appellant who reinitiated contact. In appellate brief, the appellant picked up on this theme of the verb's not needing a predicate.

While the police may not re-initiate interrogation following a suspect's invocation of his right to counsel, the rule is different if the suspect re-initiates conversation. *Yet the re-initiation by a suspect must relate to the investigation.*

(Emphasis supplied).

At the outset of our consideration of this subcontention, we used the phrase "wild goose chase." We did so because, early on as we joined the appellant in the chase, we found ourselves teetering on the brink of an abyss. We were about to fall into the esoteric welter of *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); *Blake v. State,* 381 Md. 218, 849 A.2d 410 (2004); and *Phillips v. State,* 425 Md. 210, 40 A.3d 25 (2012), as they anguished over the nuances of what words constitute a reinitiation of contact and what words do

not. Arriving like the cavalry in the nick of time was the revelation, "Who cares?" One way or the other, it simply does not make any difference. The only corner of confession law that even cares about which party reinitiated contact lies in the shadowland of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). When *Edwards* is involved, we may readily have a reinitiation problem. Conversely, when *Edwards* is not involved, the issue of reinitiation is irrelevant.

Although the appellant devotes eight full pages of his brief to the argument of this subcontention, its gist is:

> *Appellant* was arrested and interrogated after he had turned himself in on a warrant, posted bail, *invoked his right to counsel,* and hired counsel, who had entered his appearance. *The State might be tempted to claim that the Appellant re-initiated conversation, when Appellant,* after his arrest, *attempted to question the police as to why they had arrested him,* since he was out on bail. *Yet this did not constitute a re-initiation of the conversation about the crime in question.*

(Emphasis supplied).

The minor premise, that we may now mercifully avoid, is that Corporal Merritt reinitiated contact with the appellant. The major premise, which the appellant blithely takes for granted, is that Corporal Merritt was somehow prohibited by *Edwards* from reinitiating contact with the appellant. It is to that major premise, however, that we must direct our attention.

Our first step, as always, needs to be one of careful classification. What is the particular sub-category of confession law with which we need concern ourselves on this issue? With a tornado of precepts and principles and precedents swirling around outside, what are the few pertinent authorities that we need to take with us into our doctrinal cyclone cellar of the moment? In terms of identifying a proper categorizing label for the subcontention, what the appellant argues for would be, were he to prevail, a case of *"Edwards v. Arizona* Violated." With our focus primarily on his flawed major premise, howev-

er, our conclusion is that the subcontention is, rather, a case of "*Edwards v. Arizona* Inapplicable."

Our subject is obviously *Edwards v. Arizona.* Our questions will be 1) "What is *Edwards v. Arizona?* " and 2) "When does *Edwards v. Arizona* apply?" That second question is in two sub-parts: 1) "When does it first apply?" and 2) "When does it stop applying?"

What is *Edwards v. Arizona?* Notwithstanding the fact that it confers on certain subjects of interrogation a "right to counsel," *Edwards v. Arizona* is not based on the Sixth Amendment's right to the assistance of counsel. We may, therefore, conveniently brush all Sixth Amendment case law aside. *Edwards v. Arizona* arises out of the Fifth Amendment privilege against compelled self-incrimination. In order to guard a suspect from the risk of compelled self-incrimination, the Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), devised a set of two prophylactic protections. They are 1) a right to silence and 2) a right to counsel for suspects being subjected to custodial interrogation. The rest of the now-famous *Miranda* catechism simply explains or elaborates on those two prophylactic rights. All of this *Miranda* "first level of prophylaxis" applies, moreover, only in the special circumstance of custodial interrogation, the critical circumstance which the Supreme Court deems to be inherently coercive or compelling.

*Edwards v. Arizona* (1981) was decided 15 years after *Miranda. Edwards* did not alter in any way *Miranda*'s prophylactic right to counsel. What *Edwards* did to the *Miranda*-based right to counsel was to wrap around it a veritable bubble of impermeability to waiver. This is what some of the subsequent cases have called a "second layer of prophylaxis." What *Edwards* held, 451 U.S. at 484–85, 101 S.Ct. 1880, was:

> [a]dditional safeguards are necessary when the accused asks for counsel; and we now hold that *when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be estab-*

*lished by showing only that he responded to further police-initiated custodial interrogation* even if he has been advised of his rights. We further hold that *an accused*, such as Edwards, having expressed his desire to deal with the police only through counsel, *is not subject to further interrogation* by the authorities *until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.*

(Emphasis supplied). As *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990), elaborated:

*Edwards* thus established another prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.

What this means for the appellant in this case is that if he once successfully invoked his Fifth Amendment-based prophylactic right to counsel, no ostensible waiver of that right by him would be deemed voluntary if the police initiated the renewed conversation between them. If it were the appellant who initiated the recontact, on the other hand, that second layer of prophylaxis would dissolve and the waiver issue would be decided by routine *Miranda* rules as part of its first layer of prophylaxis. This anti-waiver rule of *Edwards* is why, in both the interrogation of May 6 and the suppression hearing of November 17, both parties were obsessed with the issue of whether it was the appellant or Corporal Merritt who initiated the conversation between them on May 6. They assumed that the answer to that question would determine whether *Edwards v. Arizona* had or had not been violated. They seemed to take the applicability of *Edwards* completely for granted. They fought fiercely over the minor premise, while totally ignoring the major premise. They are battling over whether *Edwards v. Arizona* was violated without having established that *Edwards v. Arizona* even applied.

It is the appellant's assumption that he successfully invoked his *Miranda*-based right to counsel on February 23, 2011. The scenario on that day, however, is exceedingly murky.

There was no testimony at the suppression hearing to establish the chronology of what happened on February 23. In his Statement of Facts, the appellant simply tells us:

> Appellant posted a $10,000 bail, and was released. When interviewed by a Sheriff, he invoked his right to counsel and questioning ceased.

Our problem is that, in terms of the appellant's entitlement to the prophylactic right to counsel or to any of *Miranda*'s protections, that statement tells us nothing. The entire package of *Miranda* protections is confined to the special context of custodial interrogation. It is custodial interrogation that is presumptively coercive and that thereby poses the threat of compelled self-incrimination that *Miranda* was devised to guard against. In *McNeil v. Wisconsin,* 501 U.S. 171, 182 n. 3, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), the Supreme Court observed that because *Miranda* rights, including the *Miranda*-based right to counsel, control only the circumstance of custodial interrogation, they may only be invoked by one who is actually in custody at the time. They may not be invoked anticipatorily.

> *We have in fact never held that a person can invoke his Miranda rights anticipatorily, in a context other than "custodial interrogation"* ... If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. *Most rights must be asserted when the government seeks to take the action they protect against.*

(Emphasis supplied).

The United States Court of Appeals for the Seventh Circuit followed suit in *United States v. LaGrone,* 43 F.3d 332, 337–38 (7th Cir.1994):

> LaGrone could not have invoked his *Miranda* right to counsel at the time he asked to call his attorney concerning the consent to search. At the time LaGrone asked to talk

to his attorney, he was not in a custodial interrogation atmosphere.

The *Miranda* right to counsel attaches only in the context of custodial interrogation. LaGrone apparently argues that once a defendant's right to counsel under *Miranda* is triggered, it is like the Energizer Bunny—it keeps going, and going, and going.... While this is true of the Sixth Amendment right to counsel—once the government initiates formal charges against the defendant, he has a right to counsel at all future "critical stages," we believe that there are certain "windows of opportunity" in which a defendant must assert his *Miranda* right to counsel. A defendant must clearly invoke his right to counsel from each constitutional source, at a time when the right is available.

See also *United States v. Grimes*, 142 F.3d 1342, 1347–48 (11th Cir.1998); *Alston v. Redman*, 34 F.3d 1237, 1246 (3d Cir.1994) ("The antipathy expressed in *McNeil* towards the anticipatory invocation of the *Miranda* rights is consistent with *Miranda*'s underlying principles."); *United States v. Thompson*, 35 F.3d 100 (2d Cir.1994); *United States v. Wright*, 962 F.2d 953 (9th Cir.1992).

In *Marr v. State*, 134 Md.App. 152, 173–78, 759 A.2d 327 (2000), this Court made an extensive survey of this prohibition on the anticipatory invocation of the *Miranda*-based right to counsel before custody had attached, pointing out that five other state courts had joined five federal circuit courts in recognizing the prohibition on jumping the gun. The holding of this Court did not break ranks.

Even if appellant's arguments discussed above had merit, we would hold that *appellant did not validly invoke his Fifth Amendment right to counsel because the invocation by counsel occurred outside of the context of custodial interrogation. Miranda's* safeguards were intended to provide protection against the inherent coerciveness of custodial interrogation.

134 Md.App. at 173, 759 A.2d 327 (emphasis supplied). Our opinion made it clear how intimately tied this right to counsel is with *Miranda* and with the Fifth Amendment privilege:

Allowing an anticipatory invocation of the *Miranda* right to counsel on these facts would extend an accused's privilege against compelled self incrimination beyond the intent of *Miranda* and its progeny.... *Because appellant's purported invocation, through his attorney, occurred before appellant was in custody, it could not operate to invoke his Fifth Amendment right to counsel.*

134 Md.App. at 177–78, 759 A.2d 327 (emphasis supplied). See also *Hoerauf v. State,* 178 Md.App. 292, 316–18, 941 A.2d 1161 (2008); *Costley v. State,* 175 Md.App. 90, 110–12, 926 A.2d 769 (2007). And see Jezic, *Maryland Law of Confessions,* § 12.4 "Invocation effective only in context of custodial interrogation," p. 611:

"A suspect's invocation of the *Miranda* right to counsel must be made in the context of custodial interrogation, or when custodial interrogation is imminent."

There is no evidence in this case that the appellant, back on February 23, ever invoked a right to counsel or ever even received *Miranda* warnings. There is certainly no indication that the appellant was ever placed in custody in order to be interrogated. All we have about the circumstances of February 23 is the following unilluminating snippet of testimony from the appellant:

When I first turned myself in, the detective and another detective, they came all and got me and [I] told him, me and my mother told him that I had a lawyer and he said okay.

There is nothing to indicate that the prophylactic gears of *Edwards v. Arizona,* with its special protection against the reinitiation of contact by the police, were ever engaged. Our conclusion based on what we know is that the appellant, back on February 23, 2011, never acquired a *Miranda–Edwards* right to counsel in the first place. Without the womb of custodial interrogation, there can never be a *Miranda*-based right to counsel.

In defense counsel's final argument at the suppression hearing, there was no mention of *Edwards v. Arizona* nor any suggestion that the appellant had ever requested that *Miranda*-based prophylactic right to counsel in order not to be subjected to custodial interrogation. On this subcontention, counsel's argument was limited to the following:

> So the officer knew or should have known that the defendant had counsel for the crime for the allegations for the case which he was investigating, the case for which the defendant was arrested and case about which he later interrogated the respondent. So these are all things that the officer knew or should have known. *When someone has counsel, police initiated interrogation is forbidden.*

(Emphasis supplied). Counsel was clearly attributing the special protection unique to the Fifth Amendment prophylactic right to the general Sixth Amendment right. That graft, however, won't take.

 This subcontention, moreover, is doubly troubled. It has viability problems at both ends of the *Edwards v. Arizona* life cycle. As the State quite astutely argues, even if, purely *arguendo*, the Fifth Amendment-based right to counsel had been invoked by the appellant pursuant to *Miranda* and *Edwards*, we would still have to look to the other end of its life cycle to see if it was still operational on May 6, 2011. The *Miranda*-based right to counsel is designed to counter the special risks arising from custodial interrogation. Just as this prophylactic right to counsel does not begin, therefore, until custody begins, so too does it end when (or shortly after) custody ends.

The case law refers to *Edwards v. Arizona*'s terminal problem as one brought on by a "break in custody." The Alpha and Omega of "break-in-custody" law is *Maryland v. Shatzer*, 559 U.S. 98, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010). The *Shatzer* opinion is, from start to finish, a further interpretation of one small part of *Edwards v. Arizona*. It is a part of the *Edwards* doctrine which, in turn, is a part of the *Miranda* doctrine. It describes when and why the special protection of

*Edwards* against involuntary waiver no longer has or needs to have any operational effect.

Justice Scalia's opinion in *Shatzer* described how *Edwards v. Arizona*'s second layer of prophylaxis is designed to counteract the coercive effects of custody:

> In *Edwards,* the Court determined that [*Johnson v.*] *Zerbst's* [304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)] traditional standard for waiver was not sufficient to protect a suspect's right to have counsel present at a subsequent interrogation if he had previously requested counsel; *"additional safeguards" were necessary. The Court* therefore *superimposed a "second layer of prophylaxis." Edwards* held:
>
> > "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [He] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484–85 [101 S.Ct. 1880].
>
> The rationale of *Edwards* is that once a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel," *"any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures'* and not the purely voluntary choice of the suspect." Under this rule, *a voluntary Miranda waiver* is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it *is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel.*

559 U.S. at ——, 130 S.Ct. at 1219–20 (emphasis supplied).

When that coercive effect of custody ends, however, so ends the need for the special protection of *Edwards v. Arizona:*

*When,* unlike what happened in these three cases, *a suspect has been released from his pretrial custody* and has returned to his normal life for some time before the later attempted interrogation, *there is little reason to think that his change of heart regarding interrogation without counsel has been coerced. He has no longer been isolated.* He has likely been able to seek advice from an attorney, family members, and friends. And *he knows* from his earlier experience *that he need only demand counsel to bring the interrogation to a halt;* and that investigative custody does not last indefinitely. In these circumstances, it is far fetched to think that a police officer's asking the suspect whether he would like to waive his *Miranda* rights will any more "wear down the accused" than did the first such request at the original attempted interrogation—which is of course not deemed coercive.

559 U.S. at ——, 130 S.Ct. at 1221 (emphasis supplied).

To guard against the possibility that the police might be tempted, in an effort to avoid the inhibiting effects of *Edwards v. Arizona,* to release a suspect and then immediately to rearrest him and to counter as well any lingering effects of the prior custody, *Shatzer* determined that the *Edwards v. Arizona* prohibition on renewed contact would continue for 14 days after the termination of custody.

*It seems to us that period is 14 days. That provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody.*

The 14–day limitation meets Shatzer's concern that a break-in-custody rule lends itself to police abuse. He envisions that once a suspect invokes his *Miranda* right to counsel, the police will release the suspect briefly (to end the *Edwards* presumption) and then promptly bring him back into custody for reinterrogation. But *once the suspect has been out of custody long enough (14 days) to eliminate its coercive effect, there will be nothing to gain* by such gamesmanship—nothing, that is, *except the entirely appro-*

*priate gain of being able to interrogate a suspect who has made a valid waiver of his Miranda rights.*

559 U.S. at ——, 130 S.Ct. at 1223 (emphasis supplied).

Even if, *arguendo*, the appellant here had effectively invoked a *Miranda*-based right to counsel on February 23, 2011, he was no longer in custody after that day. Outside the custodial womb, the coercive effect of earlier custody cannot survive for more than 14 days. Any even hypothetical right that he might have enjoyed under *Edwards v. Arizona*, therefore, would have lapsed as of March 9, 2011. At that point, the historic slate was wiped clean and the subsequent encounter of May 6, 2011 must be viewed in a totally fresh perspective insofar as *Edwards v. Arizona* and the initiation of contact is concerned. This ostensible right to a *Miranda*-based right to counsel in this case has no viability at either end of its life cycle. The *Edwards v. Arizona* immunity shield was never born. If, *arguendo*, it was born, it died within two weeks. As our subheading foretold, this subcontention is a case of "*Edwards v. Arizona* Inapplicable." From this point on in our analysis, we can totally forget about *Edwards v. Arizona.*

### *Miranda v. Arizona* Satisfied: Inferential Waivers

**No person shall be compelled in any criminal case to be a witness against himself.**

> ... *Fifth Amendment*

██ With the first two subcontentions behind us, we can now conveniently clear the calendar of all events before May 6, 2011 and focus in exclusively on the roughly three-hour period between 1 a.m. and 4 a.m. that morning of May 6. The third of the appellant's subcontentions is that the police interrogation of him during that period violated his rights under *Miranda v. Arizona.* As if *Miranda* were sitting in the eye of a hurricane, the atmosphere surrounding it is essentially non-turbulent.

Was *Miranda* applicable? Of course, it was. When the appellant was taken from a car at the northern end of the

Harry Nice Bridge at approximately 1:00 a.m., he was placed in full custodial arrest. When between 1:30 a.m. and 4:00 a.m. he was subjected to an intensive and relentless grilling by Corporal Merritt, he remained in custody and he was subjected to interrogation. Custodial interrogation, *ipso facto*, implicates the requirements of *Miranda v. Arizona*. *Miranda* itself fully explained the prophylactic protection that was its purpose to provide in order to guard against the risk of compelled self-incrimination emanating from custodial interrogation.

To summarize, we hold that *when an individual is taken into custody* or otherwise deprived of his freedom by the authorities in any significant way *and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege,* and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, *the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him* prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, *the individual may knowingly and intelligently waive these rights and agree to answer questions* or make a statement. But *unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.*

384 U.S. at 478–79, 86 S.Ct. 1602 (emphasis supplied).

What then of *Miranda*'s satisfaction? After hearing extensive testimony from both the appellant and Corporal Merritt, after hearing an audiotape of the full interrogation session, after reading a transcript of the interrogation, and after

reading memoranda of law submitted by the parties, the suppression hearing judge made detailed and explicit findings of fact:

> [*T*]*he court finds,* based on the transcript, *that the Miranda rights were given by Detective Merritt, and that Respondent stated multiple times that he understood the rights* before making an inculpatory statement. The court further finds that *at no time in the course of the recorded interviews did Respondent invoke his right to silence or his right to counsel.* The court further finds that *Respondent's responses* to the Detective's questions *constituted a course of conduct indicating a waiver of his rights to counsel and to silence.* As such, the court finds that *Respondent waived his right to counsel and to silence.*

(Emphasis supplied).

As we examine those findings and that ruling, our standard of review is clear. In *Rush v. State,* 403 Md. 68, 82–83, 939 A.2d 689 (2008), the Court set it out very clearly:

> The *factual findings* of the suppression court *and* its *conclusions regarding the credibility of testimony are accepted unless clearly erroneous.* We review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party.

(Emphasis supplied). See also *Prioleau v. State,* 411 Md. 629, 638, 984 A.2d 851 (2009); *Adams v. State,* 192 Md.App. 469, 480, 995 A.2d 763 (2010); *Massey v. State,* 173 Md.App. 94, 100–01, 917 A.2d 1175 (2007).

The trial court meticulously set out in its Opinion and Order of Court those passages from the transcript of the interrogation on which it based its findings. Just a portion of those passages is the following:

> MERRITT: I'm gonna read your *Miranda* rights. Pay attention. O.K. *You have the right to remain silent. Do you understand that?*
>
> [THE APPELLANT]: Umhm.
>
> MERRITT: Is that yes?

[THE APPELLANT]: *Yes.*

\* \* \*

MERRITT: Alright. *Anything you say can and will be used against you in a court of law. Do you understand that?*

[THE APPELLANT]: Yes.

MERRITT: *You have the right to talk to a lawyer, and have him present with you while you are being questioned. Do you understand that?*

[THE APPELLANT]: *Yes.*

MERRITT: *If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning,* if you wish. *Do you understand that?*

[THE APPELLANT]: Yes.

MERRITT: *You can decide at any time to exercise these rights, and not answer any questions or make any statements. Do you understand that?*

[THE APPELLANT]: *Yes.*

\* \* \*

MERRITT: Alright. Ah, *do you understand each of these rights I have explained to you?*

[THE APPELLANT]: Yes.

(Emphasis supplied).

▆▆ With solid support in the evidence, therefore, the court's findings that Corporal Merritt adequately gave the *Miranda* warnings and that the appellant indicated that he understood them cannot be clearly erroneous. The court's further finding that "at no time . . . did Respondent invoke his right to silence or his right to counsel" is also fully supported by the transcript. The court's final finding and ruling was that "Respondent's response to the Detective's questions constituted a course of conduct indicating a waiver of his rights to counsel and to silence."

It is apparently with respect to the last finding that the appellant wants to make his last ditch stand that the State did not satisfy *Miranda,* as he argues in his brief:

While the Appellant was informed of his rights, that information was conveyed in fits and starts, and in a disjointed manner. *The waiver itself was never obtained.*

(Emphasis supplied).

The fuller context of that argument, however, makes it clear that it was simply a part of the appellant's continuing focus on his *Edwards v. Arizona* subcontention and his obsession with the question of who initiated recontact. In any event, whether the appellant clearly raised the issue or not, the dispositive answer with respect to the trial court's finding of waiver of the prophylactic rights of both silence and counsel is to be found in *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), and in *Berghuis v. Thompkins,* 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010).

In *Davis v. United States,* the Supreme Court was dealing with a suspect who initially agreed to be interviewed but who, an hour and a half into the interview, suddenly announced, "Maybe I should talk to a lawyer." Justice O'Connor's opinion for the Court made it clear that such an ambiguous statement did not qualify as an effective invocation of the right to counsel:

Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." But *if a suspect makes a reference to an attorney that is ambiguous or equivocal* in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, *our precedents do not require the cessation of questioning.*

Rather, *the suspect must unambiguously request counsel.* As we have observed, "a statement either is such an assertion of the right to counsel or it is not." Although a suspect need not "speak with the discrimination of an Oxford don," he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *If the statement fails to meet the requisite*

*level of clarity, Edwards does not require that the officers stop questioning the suspect.*

512 U.S. at 459, 114 S.Ct. 2350 (emphasis supplied).

Neither were the officers under any obligation to stop the interview to seek to clarify the ambiguity:

We decline petitioner's invitation to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. The rationale underlying *Edwards* is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning "would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity[.]"

512 U.S. at 459–60, 114 S.Ct. 2350.

Quoting *Moran v. Burbine,* 475 U.S. at 427, 106 S.Ct. 1135, the Court indicated that Davis's already established understanding of the *Miranda* rights was enough to dispel the Fifth Amendment coercion problem:

"Full comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process."

512 U.S. at 460, 114 S.Ct. 2350. The discussion, incidentally, concluded by reminding us that there are two sides to the *Miranda* equation:

In considering how a suspect must invoke the right to counsel, we must consider the other side of the *Miranda* equation: *the need for effective law enforcement.*

512 U.S. at 461, 114 S.Ct. 2350 (emphasis supplied).

*Berghuis v. Thompkins* picked up where *Davis* left off. Justice Kennedy's opinion for the Court held, quite logically, that the invocation of both *Miranda* rights would be treated the same.

In the context of invoking the *Miranda* right to counsel, the Court in *Davis v. United States* held that a suspect must do so "unambiguously." If an accused makes a statement concerning the right to counsel "that is ambiguous or equivocal" or makes no statement, the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.

The Court has not yet stated whether an invocation of the right to remain silent can be ambiguous or equivocal, but *there is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel* at issue in *Davis.*

560 U.S. at ——, 130 S.Ct. at 2259–60 (emphasis supplied). *Berghuis* was a case in which the defendant did not expressly invoke either of the *Miranda* rights.

*Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police.* Had he made either of these simple, unambiguous statements, he would have invoked his "right to cut off questioning." Here he did neither, so he did not invoke his right to remain silent.

560 U.S. at ——, 130 S.Ct. at 2260 (emphasis supplied).

The facts in *Berghuis* are fortunately free of the wrinkle in *Davis* that the rights to silence and to counsel had already been waived when the ambiguous statement about a lawyer was made. A lawyer, confronting a foreclosure of an argument based on *Davis,* would seize immediately upon that difference in an effort to distinguish *Davis.* In *Berghuis,* by contrast, the issue was the initial waiver of the two *Miranda* rights fresh out of the starting gate and the distinction is no longer a threat.

The bottom line is that a *Miranda* waiver is not nearly as difficult to prove as it once was. *Berghuis v. Thompkins* has brought a welcome and certain symmetry to a small pocket of confession law that had theretofore been troubled by, at the very least, some overly particularized and idiosyncratic interpretations. *Berghuis v. Thompkins* is a broad statement that

embraces both the invoking and the waiving of both of *Miranda*'s prophylactic rights. The right to silence is invoked in precisely the same way that the right to counsel is invoked. The right to counsel is waived in precisely the same way that the right to silence is waived. The common invocation procedure, moreover, applies in the pre-waiver context precisely as it does in the post-waiver context.

What we earlier held, pre-*Berghuis v. Thompkins*, in *Freeman v. State*, 158 Md.App. 402, 857 A.2d 557 (2004), is hereby overruled. In this regard, see the thorough analysis of this issue by Chief Judge Krauser in *Wimbish v. State*, 201 Md.App. 239, 249–54, 29 A.3d 635 (2011), *cert. denied*, 424 Md. 293, 35 A.3d 489 (2012), in which he anticipated the rejection of *Freeman* but withheld administering the definitive *coup de grace*.

On the issue of how the State may prove the waiver of a *Miranda* right, the *Miranda* opinion itself originally seemed to suggest that such a waiver had to be explicit. As Justice Kennedy's opinion for the Court in *Berghuis* explained, however, the Supreme Court's standard for such proof has become a lot less demanding.

> *The course of decisions since Miranda ... demonstrates that waivers can be established even absent formal or express statements of waiver* that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered. The main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel.
>
> Thus, "[i]f anything, *our subsequent cases have reduced the impact of the Miranda rule on legitimate law enforcement* while reaffirming the decision's core ruling that unarmed statements may not be used as evidence in the prosecution's case in chief."

560 U.S. at ——, 130 S.Ct. at 2261 (emphasis supplied).

The initial vehicle for the relaxing of the burden of proof had been *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Justice Kennedy described the impact that *Butler* had had:

One of the first cases to decide the meaning and import of *Miranda* with respect to the question of waiver was *North Carolina v. Butler*. The *Butler* Court, after discussing *some of the problems created by the language in Miranda,* established certain important propositions. *Butler* interpreted the *Miranda* language concerning the "heavy burden" to show waiver in accord *with usual principles of determining waiver which can include waiver implied from all the circumstances.* And in a later case, the Court stated that *this "heavy burden" is not more than the burden to establish waiver by a preponderance of the evidence.*

560 U.S. at ——, 130 S.Ct. at 2261 (emphasis supplied).

▮▮▮▮ A mere failure to invoke a right, however, is not in and of itself a waiver of that right. *Miranda,* moreover, requires a waiver before an interrogation may go on. As *Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), made clear, the question whether a suspect has validly waived a right is "entirely distinct" as a matter of law from whether he invoked that right.

The *Berghuis* majority turned to that distinct question of waiver. The Court set out the two things that the State must prove to establish a valid waiver of a *Miranda* right:

The waiver inquiry "has two distinct dimensions": waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

560 U.S. at ——, 130 S.Ct. at 2260. In this case, the suppression hearing court expressly found, with support in the evidence, that the appellant voluntarily spoke about the crime of January 6, 2011, and further that the appellant had been fully informed of his *Miranda* rights and that he understood them.

▮▮▮ Once informed of and understanding his *Miranda* rights, a suspect who then voluntarily speaks to the police may be found to have implicitly waived those rights. The *Berghuis* Court explained:

[*Miranda*] does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights. As a general proposition, *the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.*

560 U.S. at ——, 130 S.Ct. at 2262 (emphasis supplied).

■ The waiver of a prophylactic right in the station house, moreover, need not possess the formality of the waiver, on the record, of a right in the courtroom, such as the right to counsel or to a jury trial or to a trial itself in the case of a guilty plea.

*Miranda rights can therefore be waived through means less formal than a typical waiver on the record in a courtroom,* given the practical constraints and necessities of interrogation and the fact that *Miranda*'s main protection lies in advising defendants of their rights.

*Id.* (emphasis supplied).

■ The waiver, moreover, need not be express, but may be inferred from the suspect's very behavior in making a statement after having received the *Miranda* advisements.

*The prosecution therefore does not need to show that a waiver of Miranda rights was express. An "implicit waiver" of the "right to remain silent" is sufficient to admit a suspect's statement into evidence. Butler made clear that a waiver of Miranda rights may be implied through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." The Court in Butler therefore "retreated" from the "language and tenor of the Miranda opinion," which "suggested that the Court would require that a waiver ... be 'specifically made.'"*

*Id.*

One tricky little nuance remained for *Berghuis* to address. Since this sort of implied waiver only occurs when the suspect

first chooses to speak, the police questioning technically occurs before there has been a waiver, in the case of *Berghuis* itself for some two hours and forty-five minutes. The Supreme Court held that the waiver need not precede the mere questions, just so long as it precedes the actual answers:

> The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights *before giving any answers or admissions.* ...
>
> \* \* \*
>
> ... Thus, after giving a *Miranda* warning, *police may interrogate a suspect who has neither invoked nor waived his or her Miranda rights.* On these premises, it follows the police were not required to obtain a waiver of Thompkins's *Miranda* rights before commencing the interrogation.

560 U.S. at ——, 130 S.Ct. at 2263–64 (emphasis supplied).

The Court's treatment of the timing problem makes eminently good sense because the undergirding concern of the Fifth Amendment is the risk of compelled self-incrimination. What needs the mantle of prophylactic protection, therefore, are the possibly incriminating answers of the suspect and not the questions of the inquisitor.

In keeping Fifth Amendment analysis and Sixth Amendment analysis scrupulously distinct, the fact that *Berghuis v. Thompkins* permits an inferential waiver of the *Miranda*-based prophylactic rights by no means implies that a similarly relaxed waiver standard will necessarily be applied to the Sixth Amendment constitutional right to counsel, at least beyond the common denominator point where a small part of the constitutional right is coextensive with and indistinguishable from the prophylactic right.

In this case, *Miranda v. Arizona* and the Fifth Amendment privilege were not violated. The suppression court's findings were not clearly erroneous and the subcontention fails. As we indicated when we took up this subcontention, the *Miranda* issue enjoyed the relative tranquility of being in the eye of the

hurricane. As we move out from *Miranda,* however, the atmosphere gets a lot brisker.

### Maryland's Common Law of Voluntariness

**"[I]t is very clear upon all the authorities that if the confession of the appellant had been induced by any threat of harm, or promise of worldly advantage held out to him . . ., it ought to be excluded."**

> **. . .** *Nicholson v. State* **(1873)**

■ The appellant's fourth subcontention is that the confession in issue was not voluntary according to the common law of Maryland. The "totality of circumstances" surrounding the appellant's confession of May 6 was fully laid out at the suppression hearing for the entire undifferentiated package of challenges. The trial court recognized that it was being called upon to decide precisely the same thing under a variety of different labels.

> *Respondent argues that his confession was not voluntary within Maryland common law.* He also makes a series of constitutional arguments, citing to the Fifth and Fourteenth Amendments of the U.S. Constitution and Articles 22 and 24 of the Maryland Declaration of Rights. *Respondent ties each of these arguments to his argument regarding common law voluntariness. Thus, the analysis of each of these sources merges with the voluntariness analysis.*

(Emphasis supplied).

If our focus in other parts of this opinion has been on differences, the focus in this pocket of the opinion is on similarities. The same evidence that supports the court's findings on the *Miranda* waivers and shields them from being clearly erroneous indistinguishably supports the court's findings on common law voluntariness. It is difficult to imagine a scenario in which the *Miranda* waivers could be deemed involuntary but the confession itself could be deemed voluntary. A suspect's voluntary and knowledgeable decision to speak is a constant.

This makes eminently good sense because the Maryland law of voluntariness and the federal law against compulsion are siblings descended from a common parentage. In *Hof v. State,* 97 Md.App. 242, 257, 629 A.2d 1251 (1993), this Court traced in meticulous detail the history of the compulsion that was to be guarded against in state court and federal court alike. The Maryland law actually preceded the federal law, as *Nicholson v. State,* 38 Md. 140, 153 (1873), first identified the general common law test for admissibility:

> "[I]t is very clear upon all the authorities, that if the confession of the appellant had been induced by any threat of harm, or promise of worldly advantage held out to him . . ., it ought to be excluded."

Eleven years after Maryland adopted the common law test for voluntariness, the Supreme Court, citing precisely the same English cases and authorities, adopted exactly the same test in *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884). In 1897, *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568, utilized the same common law test of voluntariness, theretofore recognized as *Hopt v. Utah*'s due process test, as the test as well for the compulsion that the Fifth Amendment privilege guarded against. *Hof v. State,* 97 Md.App. at 269, 629 A.2d 1251, observed, *"Bram* left no doubt that the test of voluntariness, now embodied within the Fifth Amendment privilege, was the traditional common law test of voluntariness."

Over the decades, there was regular cross-fertilization, as Maryland voluntariness cases cited *Hopt* and *Bram* and their numerous progeny and as the Supreme Court cases, in turn, frequently looked to the Maryland cases on voluntariness. When *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, held in 1964 that the Fifth Amendment privilege was binding on the states, the separated strands of common law voluntariness came together again.

*Maryland thus became the recipient a second time of the same body of confession law it had first acquired nine decades earlier.* Emanating from Lord Mansfield in *Rudd's*

*Case* in 1775 and from Baron Parke in *Regina v. Baldry* in 1852 and from numerous other common law progenitors, a single stem of legal tradition bifurcated in the late 1800's. One strand entered Maryland in 1873 with *Nicholson v. State.* The other strand entered the federal system in 1884 with *Hopt v. Utah,* was constitutionalized in 1897 with *Bram v. United States,* and was nationalized in 1964 with *Malloy v. Hogan, thereby reaching Maryland for yet a second time, ninety-one years after its initial arrival.*

97 Md.App. at 276, 629 A.2d 1251 (emphasis supplied).

When the Court of Appeals in its *Hof v. State,* 337 Md. 581, 655 A.2d 370 (1995), reviewed the decision of this Court in our *Hof v. State,* it did not take issue with this tracing of the common history. It simply declined to take the last step that this Court had taken. This Court had reasoned that if the Maryland voluntariness test and the *Miranda* voluntariness test were one and the same, then the satisfaction of *Miranda* should, *ipso facto,* qualify as the satisfaction of the Maryland voluntariness test as well. The Court of Appeals declined to buy such a "bright line formula" and insisted that the two tests must be evaluated separately and decided separately. So we may now switch lenses, to be sure, but we are still examining the same specimen. Even if there is not a precise identity between the two tests, there is nonetheless a massive similarity.

In this case, the suppression hearing court fulfilled its obligation to treat the tests separately. No less than six pages of the 14–page Opinion and Order of Court were devoted to a thoughtful consideration of the Maryland common law test, with regular reference to *Hillard v. State,* 40 Md.App. 600, 392 A.2d 1181 (1978). Albeit surveying a common evidentiary field, the Court reached a separate and distinct conclusion:

Under all of these circumstances, the Court finds that the State has met its burden of showing by a preponderance of

the evidence that the statements made by Respondent were voluntary.

This subcontention also fails.

### Sixth Amendment Right to Counsel

**In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.**

*... Sixth Amendment*

After prospecting unsuccessfully across a broad landscape, the appellant may have hit pay dirt at last with the Sixth Amendment right to the assistance of counsel.

### A. Attachment of the Right

 The initial attachment of the right in this case is uncontroversial. The very wording of the Sixth Amendment, of course, restricts its application to "criminal proceedings." Even with respect to criminal proceedings, moreover, the entire package of Sixth Amendment rights is only available to "the accused." That is in dramatic contrast to the Fifth Amendment, which is broadly available to "persons" generally. What is it then that raises one's status from the *hoi polloi* of mere "persons" to the special station of being "the accused"? The standard statement for acquisition of "accused" status is *United States v. Gouveia*, 467 U.S. 180, 187, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984):

[A] person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him.

In further explanation of how "adversary judicial proceedings have been initiated," the Court elaborated that such initiation occurs "by way of formal charge, preliminary hearing, indictment, information, or arraignment." 467 U.S. at 188, 104 S.Ct. 2292. As *Moran v. Burbine*, 475 U.S. 412, 430, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), emphatically points out, the fact that one has privately retained a lawyer does not

trigger the Sixth Amendment right to counsel. Only the honorific of "accused" can do that.

 The constitutional entitlement to counsel is a two-step process. In the first place, it is necessary that the defendant qualify as "the accused" so as to be eligible for the right generally. It is further specifically required that the defendant be at a "critical stage." The Supreme Court has made it indisputably clear that a postindictment confrontation between Government agents and the accused designed to elicit incriminating admissions qualifies as just such a "critical stage." *Montejo v. Louisiana*, 556 U.S. 778, 786, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009).

Following the appellant's arrest on a warrant on February 22, 2011, he was taken before a District Court judge and he made bail on February 23, 2011. As of February 22, therefore, the appellant was "accused" and was, therefore, entitled to counsel on the three charges of 1) first-degree assault, 2) second-degree assault, and 3) the use of a handgun. *Rothgery v. Gillespie County*, 554 U.S. 191, 194, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008) ("[T]he right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty.").

 The four later charges of 1) armed robbery, 2) simple robbery, 3) unlawful endangerment, and 4) conspiracy to commit armed robbery would not have qualified as "closely related" crimes, however, under the rigorous scrutiny of *Texas v. Cobb*, 532 U.S. 162, 173, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001), and its stern application of the "lesser included" test of *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). As *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), explained, the Sixth Amendment right to counsel is "offense specific," and the Sixth Amendment coverage of the three early charges would not have extended to the four charges that only came six weeks later.

*The Sixth Amendment right,* however, *is offense specific.* It cannot be invoked once for all future prosecutions, *for it does not attach until a prosecution is commenced,* that is, "at or after the initiation of adversary judicial criminal proceedings—whether *by way of formal charge, preliminary hearing, indictment, information, or arraignment."* (Emphasis supplied).

The indictment of April 6, 2011, however, cured that problem and conferred upon the appellant the Sixth Amendment right to counsel with respect to all seven of the ultimate charges against him (albeit redundantly with respect to the first three). As of the interrogation of May 6, 2011, the Sixth Amendment right to counsel covered the waterfront.

## B. The Core Pre–Trial Content of the Right

 Once an "accused" takes on his entitlement to counsel, as the appellant did on all charges, the police, absent a waiver from him, are barred from questioning him without his lawyer being present. In *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), Massiah had been indicted and, therefore, enjoyed Sixth Amendment protection. Unbeknownst to him, his coconspirator, Colson, agreed to cooperate with the federal investigators. Outfitted with a hidden listening device, Colson sat with Massiah in Colson's automobile and engaged in lengthy conversation. Massiah's incriminating remarks were used against him at trial. The Supreme Court reversed the conviction because the taking of the incriminatory statements violated Massiah's Sixth Amendment right to counsel.

We hold that the petitioner was denied the basic protections of that guarantee when *there was used against him* at his trial *evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.*

377 U.S. at 206, 84 S.Ct. 1199 (emphasis supplied).

Whereas *Massiah* had been a federal prosecution, *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977),

was a case from a state criminal court. Bobby Williams's arraignment in Davenport, Iowa, conferred on him the Sixth Amendment right to counsel. On the subsequent midnight ride back across the state to Des Moines, an officer's famous "Christian burial speech" was later deemed by the Supreme Court to be the functional equivalent of interrogation. With Williams's ostensible waiver of counsel being held to be ineffective, the Court condemned the interrogation as having been in violation of Williams's Sixth Amendment right.

There can be no serious doubt, either, that *Detective Leaming deliberately and designedly set out to elicit information from Williams just as surely as*—and perhaps more effectively than—*if he had formally interrogated* him. Detective *Leaming was fully aware* before departing for Des Moines that *Williams was being represented* in Davenport by Kelly and in Des Moines by McKnight. *Yet he purposely sought during Williams's isolation from his lawyers to obtain as much incriminating information as possible.* 430 U.S. at 399, 97 S.Ct. 1232 (emphasis supplied).

In *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the defendant had been indicted and was incarcerated pending trial. The prosecution used a fellow inmate to listen for, but not to elicit, possibly incriminating statements made by the defendant to fellow prisoners. Such incriminating statements were, indeed, forthcoming and they were used to help convict the defendant. The Supreme Court held that because the fellow prisoner, a paid informant working on a contingent fee basis, had deliberately "elicited" the incriminating conversation, the tactic constituted, as it had in *Massiah* and *Brewer v. Williams,* an interference with Henry's Sixth Amendment right to counsel. The Court characterized the critical question as one of "whether the Government has interfered with the right to counsel of the accused by deliberately eliciting incriminating statements." 447 U.S. at 272, 100 S.Ct. 2183.[8]

---

8. *United States v. Henry* is to be contrasted with *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), a case wherein

*Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), was also a case where the indicted defendant was engaged in unsuspecting conversation by a codefendant who was secretly cooperating with the police. The conversation was recorded. In finding a violation of the Sixth Amendment, Justice Brennan's opinion puts its finger on the core value being protected by the Sixth Amendment right. It is not, as in the case of the Fifth Amendment, a protection against compelled self-incrimination. It is, rather, "the right to rely on counsel as a 'medium' between him[self] and the State."

> The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, *the right to rely on counsel as a 'medium' between him and the State.* As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded to the accused by invoking this right. The determination *whether particular action by state agents violates the accused's right* to the assistance of counsel *must be made in light of this obligation.*

474 U.S. at 176, 106 S.Ct. 477 (emphasis supplied). See also *Baker v. State,* 157 Md.App. 600, 853 A.2d 796 (2004).

In cleanly distinguishing Sixth Amendment issues from Fifth Amendment issues, it is worthy of note that the surreptitious conversation cases of *Massiah, Henry,* and *Moulton* do not remotely involve *Miranda* or *Edwards v. Arizona* or any conceivable risk of Fifth Amendment compulsion. The statements involved in those cases were not in any way compelled or involuntary. The Sixth Amendment cases are concerned, by contrast, with an accused person's "right to rely on counsel as a medium between him[self] and the State."

It is clear that unless the appellant in this case waived his Sixth Amendment right to counsel, that right was violated by Corporal Merritt's interrogation of him on May 6, 2011. The appellant had a right to counsel and the corporal subjected

---

the Sixth Amendment right to counsel was not violated because the undercover fellow prisoner, instead of inducing conversation, acted only as a "passive listening post."

him to two and one-half hours of intense questioning without counsel being present. The State does not take issue with the fact that a *"Massiah* violation" may otherwise have occurred, but defends the challenge on the ground that the appellant waived his Sixth Amendment right to counsel. The dispositive issue is whether there was such a waiver. With the identification of that issue, we emerge at last from the doctrinal labyrinth.

## C. Waiver of the Right

The argument by both parties on waiver is all over the map and fails to focus on the very narrow waiver issue that this Court deems dispositive. The argument fails to address the difference between waiving the Fifth Amendment-based prophylactic right to counsel dealt with in *Miranda* and *Edwards v. Arizona,* on the one hand, and the waiver of other vital components of the Sixth Amendment right not concerned merely with Fifth Amendment prophylaxis, on the other. The argument simplistically assumes that the former waiver, *ipso facto,* embraces the latter or is identical with the latter. The waiver issue, however, is more nuanced than that.

The Supreme Court has handed down three major decisions on the waiver of the right to counsel. They are *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988); and *Montejo v. Louisiana,* 556 U.S. 778, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009). Even at that level, however, so much of the discussion swirls about aspects of *Edwards v. Arizona* that there has been no serious focus on the importance of the Sixth Amendment right to counsel beyond custodial interrogation. After the initiation of formal charges but before the courtroom skirmishing begins, what has the Supreme Court yet said about the right of the accused "to rely on counsel as a medium between himself and the State?" Very little.

The critical role of counsel as that medium between the defendant and the State may last for weeks or even

months. It clearly is something above and beyond the Fifth Amendment-based prophylactic right to have counsel during the limited period of custodial interrogation. If that be the case, as obviously it is, it follows that a waiver of that broader right must entail something more than a mere waiver of the right to counsel during custodial interrogation. If the broader right embraces further protection, its waiver must be correspondingly more knowledgeable so that the accused actually knows about the broader protection being waived. Even confined to the post-indictment but pre-trial stages, the constitutional right to counsel includes but is broader than the prophylactic right to counsel. The prophylactic right to counsel, for instance, affords no protection whatsoever from surreptitious interrogation, because it poses no threat of compelled self-incrimination. *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). The Sixth Amendment right to counsel, on the other hand, affords absolute protection against surreptitious interrogation, notwithstanding the total absence of any threat of compelled self-incrimination. *Massiah v. United States; United States v. Henry, Maine v. Moulton.* Their respective waivers, therefore, cannot be identical. Obsessed with *Edwards v. Arizona,* however, the Supreme Court has not truly focused on this incremental aspect of the pre-trial right to counsel or the necessary quality of its waiver.

*Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631, since overruled by *Montejo v. Louisiana,* 556 U.S. at 797, 129 S.Ct. 2079 (*"Michigan v. Jackson* should be and now is overruled."), was an *Edwards v. Arizona* case from start to finish. In that consolidated case, both defendants had been formally charged before the custodial interrogations in issue and were, therefore, "accused." The opinion accordingly frequently used the language of the Sixth Amendment right to counsel. The entire opinion, however, was only concerned with the entitlement of the two defendants to the "second layer of prophylaxis" created by *Edwards v. Arizona.* The opinion began by reciting that in *Edwards* the Court had held that once a suspect in custody expresses a desire for a lawyer,

interrogation must stop unless the prisoner himself reinitiates the conversation. The Supreme Court posed the only question before it:

"*Edwards* established a bright-line rule to safeguard pre-existing rights: once a suspect has invoked the right to counsel, any subsequent conversation must be initiated by him."

*The question presented by these two cases is whether the same rule applies to a defendant who has been formally charged with a crime and who has requested the appointment of counsel at his arraignment.*

475 U.S. at 626, 106 S.Ct. 1404 (emphasis supplied).

The 6–3 opinion of the Court held that invoking the Sixth Amendment right to counsel at an arraignment was tantamount to the invocation of the prophylactic right to counsel during custodial interrogation. Because that second, implied invocation would engage the special protection of *Edwards v. Arizona,* the subsequent and ordinary waivers of both *Miranda* rights at the defendants' interrogations were deemed ineffective because the police, rather than the defendants, had initiated the subsequent contacts. The final holding of *Michigan v. Jackson* totally imposed the entire *Edwards v. Arizona* regime onto an invocation of the Sixth Amendment right that had occurred only at arraignment.

*Edwards* is grounded in the understanding that "the assertion of the right to counsel [is] a significant event," and that "additional safeguards are necessary when the accused asks for counsel." *We conclude that* the assertion is no less significant, and *the need for additional safeguards no less clear, when the request for counsel is made at an arraignment and when the basis for the claim is the Sixth Amendment.* We thus hold that, *if police initiate interrogation after a defendant's assertion,* at an arraignment or similar proceeding, *of his right to counsel, any waiver* of the defendant's right to counsel for that police-initiated interrogation *is invalid.*

> *Although the Edwards decision itself rested on the Fifth Amendment* and concerned a request for counsel made during custodial interrogation, the Michigan Supreme Court correctly perceived that *the reasoning of that case applies with even greater force to these cases.*

475 U.S. at 636, 106 S.Ct. 1404 (emphasis supplied).

In counteracting what it deemed to be *Michigan v. Jackson*'s overreaction, the limited focus of *Montejo v. Louisiana* was made clear by its opening sentence.

> We consider in this case the scope and continued viability of the rule announced by this Court in *Michigan v. Jackson* forbidding police to initiate interrogation of a criminal defendant once he has requested counsel at an arraignment or similar proceeding.

556 U.S. at 780, 129 S.Ct. 2079. Justice Scalia's opinion made clear that *Michigan v. Jackson* had simply incorporated the special waiver protection of *Edwards v. Arizona* into a Sixth Amendment context.

> *The only question raised by this case,* and the only one addressed by the *Jackson* rule, *is whether courts must presume that such a waiver is invalid* under certain circumstances. *We created such a presumption in Jackson* by analogy to a similar prophylactic rule established to *protect the Fifth Amendment-based Miranda right to have counsel present at any custodial interrogation. Edwards v. Arizona* decided that once "an accused has invoked his right to have counsel present during custodial interrogation ... [he] is *not subject to further interrogation* by the authorities until counsel has been made available," *unless he initiates the contact.*

> *The Edwards rule is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights."* It does this by presuming his postassertion statements to be involuntary, "even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." This prophylactic

rule thus "protect[s] a suspect's voluntary choice not to speak outside his lawyer's presence."

*Jackson represented a "wholesale importation of the Edwards rule into the Sixth Amendment."*

556 U.S. at 787, 129 S.Ct. 2079 (emphasis supplied).

*Montejo* held that there was no purpose for imposing the anti-waiver protection of *Edwards v. Arizona* onto the Sixth Amendment.

*Jackson was policy driven, and if that policy is being adequately served through other means, there is no reason to retain its rule.* Miranda *and the cases that elaborate upon it already guarantee not simply noncoercion in the traditional sense, but what Justice Harlan referred to as "voluntariness with a vengeance." There is no need to take* Jackson's *further step of requiring voluntariness on stilts.*

556 U.S. at 795–96, 129 S.Ct. 2079 (emphasis supplied).

A special protection designed only for custodial interrogation, moreover, cannot be invoked, at an arraignment for instance, before one is actually in the custodial environment.

*"We have in fact never held that a person can invoke his Miranda rights anticipatorily, in a context other than 'custodial interrogation.' ..."* What matters for *Miranda* and *Edwards* is what happens when the defendant is approached for interrogation, and (if he consents) what happens during the interrogation—not what happened at any preliminary hearing.

In sum, when the marginal benefits of the *Jackson* rule are weighed against its substantial costs to the truth-seeking process and the criminal justice system, we readily conclude that the rule does not "pay its way." *Michigan v. Jackson* should be and now is overruled.

556 U.S. at 797, 129 S.Ct. 2079 (emphasis supplied). The bottom line is that neither *Michigan v. Jackson* nor *Montejo v. Louisiana* told us anything about the waiver of the right to counsel beyond the limited umbrella of *Edwards v. Arizona.*

What remains is *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261. It is *Patterson* that is almost glibly advanced by prosecutors as a virtually automatic waiver of the Sixth Amendment right whenever *Miranda* is satisfied. It is no such thing. *Patterson* asserts, to be sure, that a waiver of the *Miranda*-based right to counsel is, *ipso facto*, an adequate waiver of the Sixth Amendment right to counsel. A close reading of *Patterson*, however, makes it clear that the precise aspect of the Sixth Amendment right to counsel being discussed is only that part of the right that is indistinguishable from the *Miranda*-based prophylactic right to counsel. Patterson's constitutional right to counsel arose from the fact that he had already been indicted when he made the confession at issue in the case. There was no discussion in the Supreme Court's opinion, however, of any right to counsel other than the right to have counsel present at the custodial interrogation.

Patterson adequately waived his *Miranda* rights before confessing. Part of his subsequent argument was that the constitutional right to counsel is superior to the prophylactic right to counsel and requires, therefore, a higher quality of waiver.

On appeal, petitioner argued that he had not "knowingly and intelligently" waived his Sixth Amendment right to counsel before he gave his uncounseled postindictment confessions. *Petitioner contended that the warnings he received, while adequate for the purposes of protecting his Fifth Amendment rights as guaranteed by Miranda, did not adequately inform him of his Sixth Amendment right to counsel.*

487 U.S. at 289, 108 S.Ct. 2389 (emphasis supplied). The Court made it clear that, with respect to the same protection, the waiver of the protection under one label is no different than the waiver of the same protection under a different label. There is no question of one right being superior to another.

We consequently reject *petitioner's argument,* . . . that since "the Sixth Amendment right [to counsel] is far superi-

or to that of the Fifth Amendment right" and since *"[t]he greater the right the greater the loss from a waiver of that right,"* waiver of an accused's Sixth Amendment right to counsel should be "more difficult" to effectuate than waiver of a suspect's Fifth Amendment rights. While our cases have recognized a "difference" between the Fifth Amendment and Sixth Amendment rights to counsel, and the "policies" behind these constitutional guarantees, *we have never suggested that one right is "superior" or "greater" than the other, nor is there any support* in our cases for *the notion that because a Sixth Amendment right may be involved, it is more difficult to waive than the Fifth Amendment counterpart.*

487 U.S. at 297–98, 108 S.Ct. 2389 (emphasis supplied). Our present point is that nothing thus far in the *Patterson* opinion was discussing any aspect of the Sixth Amendment right to counsel that was not coterminous with the *Miranda*-based right to counsel. There was no recognition of any possible incremental right to counsel that reaches out beyond the prophylactic right.

One of Patterson's arguments against any waiver of counsel on his part got back into the familiar *Edwards v. Arizona* scenario.

Petitioner's first claim is that *because his Sixth Amendment right to counsel arose with his indictment, the police were thereafter barred from initiating a meeting with him. He equates himself with a preindictment suspect who, while being interrogated, asserts his Fifth Amendment right to counsel;* under *Edwards v. Arizona,* such a suspect may not be questioned again unless he initiates the meeting.

*Petitioner,* however, *at no time sought to exercise his right to have counsel present.* The fact that petitioner's Sixth Amendment right came into existence with his indictment, i.e., that he had such a right at the time of his questioning, does not distinguish him from the preindictment interrogatee whose right to counsel is in existence and available for his exercise while he is questioned. Had petitioner indicated he wanted the assistance of counsel, the

authorities' interview with him would have stopped, and further questioning would have been forbidden (unless petitioner called for such a meeting). This was our holding in *Michigan v. Jackson*, which applied *Edwards* to the Sixth Amendment context.

487 U.S. at 290–91, 108 S.Ct. 2389 (emphasis supplied).

What Patterson was attempting to do, notwithstanding never having made an in-custody request for counsel so as to acquire the benefit of the *Edwards v. Arizona* second layer of prophylaxis, was to claim that his Sixth Amendment right to counsel arising out of his indictment automatically entitled him to the *Edwards v. Arizona* second layer of prophylaxis. In rejecting that argument, the Supreme Court held that the otherwise efficacious *Miranda* waiver of counsel, in a case where counsel had never actually been requested in the custodial setting, effectively waived that second layer of prophylaxis even if it were considered part of the Sixth Amendment right.

The Supreme Court rejected the argument on the ground that, although Patterson got his right to counsel automatically upon his indictment, he had never actually asked for counsel, as *Edwards v. Arizona* required. (This distinction between asking for counsel and getting counsel automatically was a sub-holding of *Michigan v. Jackson* that also was repudiated by *Montejo v. Louisiana*.) Our present point, once again, is that the *Patterson* opinion was still not dealing with any aspect of the Sixth Amendment right that is not coterminous with the prophylactic right. There was no indication, therefore, that a *Miranda* waiver reached beyond the *Miranda*-based right, even if that right had a Sixth Amendment label on it.

When *Patterson* equated a waiver of the *Miranda*-based prophylactic right with a waiver of the Sixth Amendment right, it clearly did so in the limited context of custodial interrogation where the two rights were coterminous:

[T]he key inquiry in a case such as this one must be: Was the accused, who waived his Sixth Amendment rights during postindictment questioning, made sufficiently aware of *his*

*right to have counsel present during the questioning,* and of the possible consequences of a decision to forgo the aid of counsel? In this case, we are convinced that by admonishing petitioner with the *Miranda* warnings, respondent has met this burden and that *petitioner's waiver of his right to counsel at the questioning* was valid.

We emphasize the significance of the fact that *petitioner's waiver of counsel was* only for his limited aspect of the criminal proceedings against him—*only for postindictment questioning. Our decision on the validity of petitioner's waiver extends only so far.*

487 U.S. at 292–93, 293 n. 5, 108 S.Ct. 2389 (emphasis supplied).

In describing the specific content of the right to counsel that Patterson was waiving, the Supreme Court clearly was not referring to any aspect of the right that went beyond the *Miranda*-based right to have counsel present so as to counteract the risk of compelled self-incrimination.

[T]he *Miranda* warnings also served to make petitioner aware of the consequences of a decision by him to waive *his Sixth Amendment rights during postindictment questioning.* Petitioner knew that any statement that he made could be used against him in subsequent criminal proceedings. *This is the ultimate adverse consequence petitioner could have suffered* by virtue of his choice to make uncounseled admissions to the authorities. *This warning also sufficed ... to let petitioner know what a lawyer could "do for him" during the postindictment questioning: namely, advise petitioner to refrain from making any such statements.*

487 U.S. at 293–94, 108 S.Ct. 2389 (emphasis supplied). In assessing the very limited nature of that part of the right to counsel being waived, the Supreme Court was also dealing with a situation where the suspect was in lawful custody and counsel's limited value under the circumstances was to sit there with the suspect and tell him not to say anything. It was not the very different situation where counsel could have

insisted, based on the Sixth Amendment, that no interrogation even take place.

> An important basis for our analysis is our understanding that *an attorney's role at postindictment questioning is rather limited, and substantially different from the attorney's role in later phases of criminal proceedings.* ... *[D]uring postindictment questioning, a lawyer's role is rather unidimensional:* largely *limited to advising his client as to what questions to answer and which ones to decline to answer.*

487 U.S. at 294 n. 6, 108 S.Ct. 2389 (emphasis supplied).

The Court thus took a very narrow view of the help that an attorney could provide. That accordingly was the narrow scope of the right being waived and the relaxed nature of the waiver. Justice White's opinion for the Court reaffirmed the limited view it took of what counsel could do at an interrogation.

> Because *the role of counsel at questioning is relatively simple and limited,* we see no problem in having *a waiver procedure at that stage which is likewise simple and limited.*

487 U.S. at 299, 108 S.Ct. 2389. That limited view of counsel's function quite clearly informed the Court's analysis of the limited scope of the right being waived.

> Instead, we have taken *a more pragmatic approach* to the waiver question—*asking* what purposes a lawyer can serve at the particular state of the proceedings in question, and *what assistance he could provide to an accused at that stage—to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized.*

487 U.S. at 298, 108 S.Ct. 2389 (emphasis supplied).

The *Patterson* holding was thus silent on the effect of a *Miranda* waiver on the right to counsel beyond the narrow context of custodial interrogation, and *Patterson*, therefore, should not be read overbroadly with respect to an issue that was not before the Court. The Supreme Court itself was,

indeed, conscious of the fact that to satisfy or to waive *Miranda* is not *ipso facto* to satisfy or to waive the Sixth Amendment more broadly:

> *This does not mean, of course, that all Sixth Amendment challenges to the conduct of postindictment questioning will fail whenever the challenged practice would pass constitutional muster under Miranda.* For example, we have permitted a *Miranda* waiver to stand where a suspect was not told that his lawyer was trying to reach him during questioning; *in the Sixth Amendment context, this waiver would not be valid.*

487 U.S. at 296 n. 9, 108 S.Ct. 2389 (emphasis supplied).

## D. The Waiver In This Case

 The State is content to rely on *Patterson v. Illinois.* We, however, take a broader view than does the State of this 17-year-old juvenile's right to counsel in the present case. It was not limited to counsel's presence during the interrogation of May 6 and, therefore, could not so simply be waived. This appellant had had privately retained counsel for two and one-half months before he was subjected to interrogation on May 6. That contractual right to counsel had ripened into a constitutional right to counsel as to some, if not all, of the charges against him as of February 23, 2011, ten weeks before he was interrogated without counsel. The contractual right to counsel had ripened into a constitutional right to counsel indisputably with respect to all charges with the indictment of April 6, a full month before the appellant was subjected to uncounseled interrogation The State, as an entity, was fully aware, moreover, of both the appellant's constitutional right to counsel and his contractual retention of counsel.

In terms of what *Maine v. Moulton,* 474 U.S. at 176, 106 S.Ct. 477, referred to as "the right to rely on counsel as a medium between him and the State," we think that *Patterson v. Illinois,* 487 U.S. at 296 n. 9, 108 S.Ct. 2389, was prophetic about the difference between the narrow waiver issue before it and the broader waiver issue now before us.

Thus, because the Sixth Amendment's protection of the attorney-client relationship—*"the right to rely on counsel as*

*a 'medium' between [the accused] and the State "—extends beyond Miranda's protection of the Fifth Amendment right to counsel,* see *Maine v. Moulton,* 474 U.S. at 176 [106 S.Ct. 477], *there will be cases where a waiver which would be valid under Miranda will not suffice for Sixth Amendment purposes.*

(Emphasis supplied).

The Sixth Amendment case law is replete with cases where there was no conceivable threat of compelled self-incrimination and where *Miranda* and the Fifth Amendment were not remotely involved. Those were cases where the constitutional violation consisted of subjecting an indicted defendant to the interrogation process in the first instance without counsel being present: *Massiah v. United States,* 377 U.S. at 206, 84 S.Ct. 1199, where incriminating words were "deliberately elicited from him after he had been indicted and in the absence of counsel"; *United States v. Henry,* 447 U.S. at 274, 100 S.Ct. 2183, where the prisoner was placed in an ostensibly non-threatening circumstance but one "likely to induce" incriminating admissions; and *Maine v. Moulton,* 474 U.S. at 176, 106 S.Ct. 477, where the State violated its "affirmative obligation not to act in a manner that circumvents the protections accorded to the accused." The lack of any *Miranda* violation by no means precluded the finding of a Sixth Amendment violation, as *Patterson v. Illinois* described:

Likewise *a surreptitious conversation* between an undercover police officer and an unindicted suspect *would not give rise to any Miranda violation* as long as the "interrogation" was not in a custodial setting; *however, once the accused is indicted, such questioning would be prohibited.*

487 U.S. at 296 n. 6, 108 S.Ct. 2389 (emphasis supplied). This appellant, by retaining counsel, had indeed gone further than had the defendants in *Massiah, Henry,* and *Moulton* to guarantee himself a legal medium to stand between himself and the State.

We hold that the appellant had a Sixth Amendment right to counsel during the early morning hours of May 6 that went

beyond the mere Fifth Amendment-based right to the presence of a lawyer during custodial interrogation. That lesser right to a lawyer during custodial interrogation may well have been waived pursuant to the relaxed waiver standard of *Berghuis v. Thompkins,* but the extended or incremental right to have "counsel as a medium between himself and the State" was, we hold, not voluntarily and knowledgeably waived.

This appellant had the right to have the fact of his April 6, 2011 indictment communicated to his lawyer, if not to himself, a full month before he was subjected to uncounseled interrogation. Whatever the intricacies of the appellant's right to continue on bail pursuant to Criminal Procedure Article, § 5–206 and Maryland Rules of Procedure § 4–212(d)(2) and 4–216.1(b) and (c) may have been, there should have been a full month for appellant's counsel to come in and to figure out with the circuit court whether appellant's original bail should continue or whether it would have to be renewed or otherwise amended.[9] In no event should the appellant have been treated as a bail-less fugitive from justice on the early morning of May 6.

*Maine v. Moulton,* 474 U.S. at 177, 106 S.Ct. 477, described this scope of the constitutional right that indisputably was not limited to custodial interrogation:

> The Sixth Amendment protects *the right of the accused not to be confronted by an agent of the State regarding matters as to which the right to counsel has attached without counsel being present.* This right was *violated as soon as the State's agent engaged Moulton in conversation about the charges pending against him.*

(Emphasis supplied).

Had counsel been present before any interrogation on May 6 began, as he should have been, counsel would have protested

---

9. The fact that possible violations of those provisions were not a sufficient predicate in their own right for the suppression of the confession does not suggest that they may not have been significant factors in assessing what counsel could have done for the appellant, had counsel been properly informed, by way of preventing the rearrest and interrogation of May 6, 2011.

that the appellant was on bail and was not subject to arrest in the first place. Counsel would not merely have sat in on a custodial interrogation. Counsel would have insisted that no interrogation even take place. Counsel's role would have been more than that contemplated by *Miranda.* The appellant was not informed about any of these aspects of his right to counsel and any ostensible waiver of them was correspondingly not knowledgeable. *See Adams v. State,* 192 Md.App. 469, 479–96, 995 A.2d 763 (2010).

When, moreover, does one waive the Sixth Amendment right not to be interrogated without counsel being present? In the cases of *Michigan v. Jackson, Patterson v. Illinois,* and *Montejo v. Louisiana,* the defendants expressly waived the right to counsel and agreed to talk in the opening minutes of their respective confrontations. This appellant, on the other hand, never did expressly waive his right to counsel.

The suppression court was furnished with tape recordings and transcripts of four separate segments of the interrogation of the appellant by Corporal Merritt that extended from 1:24 a.m. to 3:57 a.m. on the morning of May 6, 2011. The appellant never expressly waived either of his *Miranda* rights. The inferential waiver of these rights, pursuant to *Berghuis v. Thompkins,* consisted of his making an incriminating admission after having steadfastly declined to do so for two hours. The inferential waiver, moreover, is not to be found on the recording or in the transcript. It occurred during an unrecorded interlude between the second and third segments of the interrogation. Ironically, the most critical action in the entire drama took place off-stage. At 3:24 a.m., Corporal Merritt began the third segment of the interrogation by announcing:

MERRITT: Alright. And, during the, I stopped the recorder, ahm, ah, because you asked me to, correct?

[THE APPELLANT]: Um hm (positive response)

MERRITT: And *during that, you told me what, what took place, correct?*

[THE APPELLANT]: *Yes.*

(Emphasis supplied).

Even by the relaxed standard of *Berghuis v. Thompkins,* that is thin gruel for an effective waiver. Even if it passed muster for a Fifth Amendment interrogation, as we have held it did, it did not waive the broader Sixth Amendment right of the appellant to counsel in this case. The difference between the broader constitutional right to counsel and that narrower part of it that is co-extensive with the *Miranda*-based prophylactic right could not be more dramatic.

■ The prophylactic right to counsel only comes into existence when it is unambiguously invoked, perhaps deep into the interrogation, if ever. The constitutional right to counsel, by contrast, comes into existence automatically, whether invoked or not, at the moment the suspect is formally charged. The critical time period for the waiver of the prophylactic right pursuant to *Berghuis v. Thompkins* is as late as when incriminating words are finally spoken. The constitutional right to counsel is unconcerned with when incriminating words are spoken. Its critical time period is when an uncounseled interrogation begins. For *Berghuis v. Thompkins* waiver purposes, the waiver of the prophylactic right to counsel depends in part upon the fact that it was never invoked. The fuller constitutional right to counsel, by contrast, doe not need to be invoked. It automatically applies and does not, therefore, share with its prophylactic counterpart the vulnerable status of being "uninvoked." The effective inferential waiver of the prophylactic right, moreover, depends upon the fact that the suspect is fully aware of his entitlement to counsel. The *Massiah*-based constitutional right to counsel, by contrast, does not involve any necessary *Berghuis v. Thompkins* knowledge of its existence by the suspect. The constitutional right to counsel simply would not qualify for a *Berghuis v. Thompkins* variety of waiver.

The flaw in the State's argument is readily perceptible if we calibrate the argument closely. The State relies on *Patterson v. Illinois* for the proposition that a *Miranda* waiver of the

prophylactic right to counsel will also serve as a waiver of the self-same Sixth Amendment right to counsel in that setting of custodial interrogation. That *Miranda* waiver in this case depends, in turn, upon *Berghuis v. Thompkins* and its holding that a *Miranda* waiver may be inferred from the suspect's very act of speaking after having been informed of the right not to speak. In this case, that waiver came at precisely 3:24 a.m. when the appellant first began to incriminate himself. The act of self-incrimination and the waiver of the protection against self-incrimination came in the same breath, just as had been the case in *Berghuis v. Thompkins*.

*Berghuis v. Thompkins*, however, was not a Sixth Amendment case. The Sixth Amendment, per *Massiah v. United States*, conferred on the appellant the right not to be interrogated at all without his lawyer being present. Yet the appellant was interrogated without his lawyer being present from 1:24 a.m. continuously through 3:24 a.m. That Sixth Amendment right clearly was violated and that right clearly had not been waived. The inferential waiver of 3:24 a.m. came after that two-hour stretch of uncounseled interrogation, not before it. For the two hours between 1:24 a.m. and 3:24 a.m., the appellant had no prophylactic right to counsel because he had not invoked it. During all of that two-hour period, however, he very definitely had a Sixth Amendment right to counsel, which did not depend on its being invoked. The constitutional right against uncounseled interrogation is significantly broader than the prophylactic right against uncounseled self-incrimination.

In applying *Berghuis v. Thompkins*, a major factor in this case is that between 1:24 a.m. and 3:24 a.m. the appellant had never invoked his *Miranda*-based right to counsel and that that prophylactic right, therefore, could not have been violated at a time when it was not yet in existence. His constitutional right to counsel under *Massiah*, by dispositive contrast, was automatically in existence and had been continuously violated for two hours. The appellant, to be sure, did not incriminate himself during that two-hour stretch, but self-incrimination is a Fifth Amendment concern. See *Chavez v. Martinez*, 538

U.S. 760, 766–70, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003). The Sixth Amendment is concerned with the right of the appellant, as "the accused" and particularly as a 17-year-old juvenile "accused," to have his lawyer present as a necessary medium between himself and Detective Corporal Merritt between 1:24 and 3:24 a.m. That right was never waived. It was certainly not waived *nunc pro tunc.*

■ We hold that the broader Sixth Amendment protection of counsel, as a necessary medium between the appellant and the State, is not vulnerable to a waiver by inference from merely informed silence or from merely the act of confessing itself after having been given *Miranda* rights. Even to speak of the right not to be interrogated at all being waived by inference two hours deep into the interrogation is an oxymoron. In a variety of ways, this appellant was denied his Sixth Amendment right to have "counsel as a medium between himself and the State." His confession was a direct and unattenuated fruit of that violation and should have been suppressed. This fifth subcontention does not fail, and the appellant's conviction must be reversed.

### Conclusion

To be told everything is as daunting as to be told nothing. Our main task on this appeal has been one of sorting. Unsorted, the kaleidoscope would have been incomprehensible.

The key to understanding the law of confessions is to understand that there is no law of confessions. There are, however, many laws of confessions. The secret to survival is to think plural.

**JUDGMENT REVERSED; COSTS TO BE PAID BY ST. MARY'S COUNTY.**